655 A.2d 901

**Nina BECKMAN et al.**

v.

**Kenneth L. BOGGS et ux.**

**No. 78, Sept. Term, 1994.**

Court of Appeals of Maryland.

March 22, 1995.

Robert W. Hamilton, Cumberland, for appellant.

William M. Rudd (Anderson, Rudd & Donahue, on brief), Cumberland, for appellee.

Argued Before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

MURPHY, Chief Judge.

In this case we must determine whether the adoption of a child by her maternal grandparents, following the death of her natural mother and with the consent of her natural father, precludes her paternal grandparents from petitioning for visitation with her pursuant to Maryland Code (1984, 1991 Repl. Vol., 1994 Cum.Supp.) § 9–102 of the Family Law Article.[1] If adoption is not found to entirely extinguish these grandpar-

---

1. Unless otherwise indicated, all statutory references are to the Maryland Code (1984, 1991 Repl.Vol.), Family Law Article.

ents' rights, we must then decide whether awarding visitation in this case would be in the child's best interest.

## I.

At issue in this case is the proper interplay between the State's adoption provisions, § 5–301 *et seq.*, and its grandparent visitation statute, § 9–102. The concept of adoption did not exist at common law. The Maryland General Assembly has enacted a comprehensive statutory scheme to govern this area. *Stambaugh v. Child Support Admin.*, 323 Md. 106, 110, 591 A.2d 501 (1991). It is codified at §§ 5–301 through 5–330 of the Family Law Article. *Id. See also Carroll County v. Edelmann*, 320 Md. 150, 577 A.2d 14 (1990); *In re Lynn M.*, 312 Md. 461, 463, 540 A.2d 799 (1988). The provisions that impact the decision in the instant case are as follows. Section 5–308(b) states:

"after a decree of adoption is entered:

(1) the individual adopted:

(i) is the child of the petitioner for all intents and purposes; and

(ii) is entitled to all the rights and privileges of and is subject to all the obligations of a child born to the petitioner in wedlock;

(2) each living natural parent of the individual adopted is:

(i) relieved of all parental duties and obligations to the individual adopted; and

(ii) divested of all parental rights as to the individual adopted; and

(3) all rights of inheritance between the individual adopted and the natural relatives shall be governed by the Estates and Trusts Article." [2]

---

**2.** The applicable provision is contained in Maryland Code (1957, 1991 Repl.Vol.), § 1–207(a) of the Estates and Trusts Article, which provides:

"An adopted child shall be treated as a natural child of his adopting parent or parents. On adoption, a child no longer shall be considered a child of either natural parent, except that upon adoption by

The effect of this provision is that the adopted child is endowed with the status of a natural child of the adoptive parents and the adoptive parents are accorded all the rights and obligations of a natural parent.

The policies and procedures underlying the adoption rules are deemed to be socially necessary and desirable. *See* § 5–303(a). One of their principal aims is to encourage the creation of new familial affiliations and to safeguard adoptive parents "from a future disturbance of their relationship with the [adopted] child." *Id.* Finally, as with custody and visitation determinations, the paramount consideration guiding decisions concerning adoption is what best serves the interest of the child. *Petrini v. Petrini,* 336 Md. 453, 469–70, 648 A.2d 1016 (1994). *See also In re Adoption No. 10941,* 335 Md. 99, 113–14, 642 A.2d 201 (1994); *In re Adoption No. A91–71A,* 334 Md. 538, 561, 640 A.2d 1085 (1994).

The right to grandparent visitation is codified at § 9–102. It provides that "[a]n equity court may: (1) consider a petition for reasonable visitation of a grandchild by a grandparent; and (2) if the court finds it to be in the best interests of the child, grant visitation rights to the grandparent." [3] In *Fairbanks v. McCarter,* 330 Md. 39, 49, 622 A.2d 121 (1993), we

---

the spouse of a natural parent, the child shall still be considered the child of that natural parent."
*See also Hall v. Vallandingham,* 75 Md.App. 187, 191–93, 540 A.2d 1162 (1988) ("We think that the current statute, Est. & Trusts Art. § 1–207(a), did not alter the substance of the 1963 act which eliminated dual inheritance [from both a child's natural and adoptive families].").

3. The General Assembly amended § 9–102 in 1993 by deleting the introductory phrase, "[a]t any time after the termination of a marriage by divorce, annulment, or death," from the statute. The purpose of the revision, according to the bill's title (ch. 252 of The Acts of 1993), was to "clarify the rights of grandparents to petition for and the power of the equity court to grant certain visitation rights under certain circumstances." Some of the circumstances implicated by the revision have been held to include situations in which grandparents of children born out of wedlock seek visitation with their grandchildren and those in which grandparents who are estranged from their children have been denied a reasonable opportunity to see their grandchildren. *See, e.g., Skeens v. Paterno,* 60 Md.App. 48, 480 A.2d 820, *cert. denied,* 301 Md. 639, 484 A.2d 274 (1984).

held that exceptional circumstances, apart from what is in the child's best interest, need not be shown as a precondition justifying grandparental visitation. We further concluded: "The statute's use of the word 'may,' rather than 'shall,' signifies that the steps prescribed in § 9–102 are available, but not mandatory.... The discretionary import of the statute is thus consonant with the common-law rule that grandparents have no inherent right to custody of their grandchildren." *Id.* at 46–47, 622 A.2d 121. The legislative history of this provision verifies the fact that neither are grandparents automatically deemed to be entitled to visitation rights. *Id.* at 47, 622 A.2d 121.

■ While grandparents are clearly part of a class that may be eligible for such a privilege, an actual grant of visitation is dependent on a chancellor's determination that it will be in the grandchild's best interest. As we stated in *Fairbanks:* "The outcome of the grandparents' petition lies within the sound discretion of the trial court, guided solely by the best interests of the grandchild." *Id.* at 49, 622 A.2d 121. *See also Petrini, supra,* 336 Md. at 469–70, 648 A.2d 1016. In other words, a visitation award is not granted for the grandparents' gratification or enjoyment, but to fulfill the needs of the child. *Id.* In making such decisions the court must focus exclusively on the welfare and prospects of the child. *Id.* 330 Md. at 50, 622 A.2d 121. While all relevant factors and circumstances should be considered in assessing what will best serve the child's interest, we have set forth some special criteria with regard to grandparental visitation. These include, but are not limited to:

"the nature and stability of the child's relationships with its parents; the nature and substantiality of the relationship between the child and the grandparent, taking into account frequency of contact, regularity of contact, and amount of time spent together; the potential benefits and detriments to the child in granting the visitation order; the effect, if any, grandparental visitation would have on the child's attachment to its nuclear family; the physical and emotional

health of the adults involved; and the stability of the child's living and schooling arrangements."

*Id.*

## II.

Kenneth A. Boggs (Kenny) and Kathie O'Neal (Kathie) were married on June 28, 1986. Their only child, Audriana, was born on September 11, 1991. Approximately four months after their daughter's birth, the couple separated and Kathie and Audriana went to live with Kathie's mother, Nina, and stepfather, Carlton (collectively, the Beckmans). Kenny and Kathie subsequently divorced, leaving decisions concerning visitation up to Kathie who retained custody of Audriana.

During the first month of her life, Kenny's parents, Jane and Kenneth L. Boggs (collectively, the Boggses) saw their grandchild several times. Soon after this, however, Audriana became ill and was admitted to a hospital in Morgantown, West Virginia. Jane stayed with her granddaughter there until Kathie asked her to leave, complaining that she and Audriana needed to get more rest. In February, 1992, after the child was released from the hospital, it is alleged that Kathie brought Audriana to see the Boggses on numerous occasions, often leaving her with them for three or four hours at a time while she worked. The Boggses contend that the last time they were permitted to see Audriana was on July 6, 1992. Nina Beckman claims that the last contact took place in April of 1992.

In October, 1992, Kathie was diagnosed with leukemia and her mother quit her job to help her care for Audriana. Kathie succumbed to her illness on August 9, 1993. On October 19, 1993, the Beckmans filed a petition in the Circuit Court for Allegany County to adopt Audriana. The court granted the adoption on November 12, 1993, reserving visitation rights in the child's father who consented to the adoption.[4] Kenny's

---

4. The retention of visitation rights in Kenny was made by way of a separate agreement between him and the Beckmans. In *Weinschel v.*

reasons for agreeing to his daughter's adoption by the Beckmans were several. First, he wanted to be sure that Audriana would be taken care of if anything were to happen to him. He also wanted her to be with people that she already knew and with which she felt comfortable. And, finally, as a result of bad memories of his own childhood, he did not want his mother to have the opportunity to raise Audriana or to expose her to the negative atmosphere that he had been subject to growing up.

The Boggses claim that they made at least one effort to see their grandchild between July of 1992 and August of 1993 when Kathie died; however, they maintain that the visit was discouraged by the Beckmans due to their daughter's condition. After Kathie's death, additional attempts at visitation were made by the Boggses, but, according to them, these requests were also refused. The Boggses contend that they have been denied all access to their grandchild since July 6, 1992. As a result of their inability to secure visitation with their only granddaughter, on October 26, 1993, the Boggses filed a Petition for Visitation in accordance with § 9–102. The Beckmans opposed the visitation request, claiming that the intervening adoption of Audriana by them terminated any rights that the Boggses may have had to visitation and, in the alternative, that visitation with them would not be in the child's best interest.

On February 22, 1994, a hearing was held in the Circuit Court for Allegany County (Leasure, J.). The court concluded that Audriana's adoption did not prevent the Boggses from seeking visitation with their granddaughter and it subsequently granted such contact, finding that it would be in the child's best interest to do so. The Beckmans then noted an appeal to the Court of Special Appeals, requesting a reversal of the

*Strople,* 56 Md.App. 252, 261, 466 A.2d 1301 (1983), the Court of Special Appeals held that natural and adoptive parents may enter into agreements with regard to visitation of adopted children by their natural parents, which are enforceable as a matter of contract law, so long as they are in the children's best interest and are not violative of public policy.

circuit court's order granting the Boggses visitation rights. We granted certiorari prior to intermediate appellate review to address the important issues raised by this case.

### III.

The Beckmans argue that their adoption of Audriana with the consent of her natural father terminated any rights that the Boggses may previously have enjoyed with regard to their granddaughter, including the right to petition for visitation with her. The Boggses disagree, contending that such a conclusion results from a misinterpretation of the adoption and grandparent visitation provisions of the Family Law Article. In essence, the proper interrelation between these two important areas of law is what is of concern in this case.[5]

Both sides rely on *In re Adoption No. 92A41*, 95 Md.App. 461, 622 A.2d 150 (1993), in support of their position. In that case, the maternal grandmother of two children whose mother had died and whose father had remarried petitioned the court for visitation with her grandchildren, which was granted. The children's stepmother later sought to and succeeded in adopting her husband's children. The grandmother then petitioned for a continuation of her visitation. The court denied her petition, determining that the intervening adoption of the children by their stepmother had terminated the grandmoth-

---

**5.** Other jurisdictions have dealt with this dilemma in a variety of different ways, most often by enacting a specific statutory provision that explicitly addresses the issue raised in this case—the effect of adoption on grandparent visitation. For a detailed review of the statutory schemes in other states to address this problem, *see* Zabolotsky, *To Grandmother's House We Go: Grandparent Visitation After Stepparent Adoption*, 32 Wayne L.Rev 1 (Fall 1985). *See also People In Interest of N.S.*, 821 P.2d 931, 932 (Colo.App.1991) (The statutory visitation rights of paternal grandparents do not survive the termination of the natural parents' legal rights and the final adoption of the child by the maternal grandparents); *Bond v. Yount*, 47 Wash.App. 181, 734 P.2d 39 (1987) (Paternal grandparents had no standing to petition for visitation with grandchild who had been previously adopted by the maternal grandparents). *But see contra Layton v. Foster*, 61 N.Y.2d 747, 472 N.Y.S.2d 916, 460 N.E.2d 1351 (1984) (Natural father's consent to adoption by stepfather did not necessarily terminate the rights of his parents to visitation if that was found to be in the child's best interest).

er's right to seek further visitation with them. The Court of Special Appeals vacated the judgment of the circuit court, holding that "upon the death of a natural parent and the adoption of the child by a stepparent, a grandparent remains eligible under section 9–102 to petition the court for visitation." *Id.* at 469, 622 A.2d 150.

The Beckmans contend that there are significant differences in the fact pattern of *In re Adoption No. 92A41*, which make its narrow holding inapplicable to the instant case. First, in *In re Adoption No. 92A41*, the mother was deceased and it was *her* parent who was seeking visitation with the grandchildren. In the present case, however, it is the parents of a living natural father who has voluntarily consented to the adoption of his daughter who are petitioning for visitation. The Beckmans argue that § 5–308(b)(2) only expressly divests *living* natural parents of their parental rights as to the individual adopted. They contend that the provision was clearly not intended to affect the status of deceased parents, which is what *In re Adoption No. 92A41* holds. In that case, the Court of Special Appeals concluded: "[Even if] § 5–308 is properly read to void parental rights of 'living natural parents' (an issue which we do not decide here), it clearly does not purport to terminate the rights of a *deceased* parent's mother or father." *In re Adoption No. 92A41, supra*, 95 Md.App. at 465–66, 622 A.2d 150 (emphasis added). According to this, a deceased parent, does not, simply by his or her death, surrender the parental rights to which that person was entitled in life and, accordingly, the parents of the deceased also retain their rights as grandparents after their child's death. In support of this view, the Court of Special Appeals stated: "Since the deceased father continues to be a parent, we find his parents should continue to be considered grandparents." *Id.* at 468, 622 A.2d 150 (quoting *In Matter of C.G.F.*, 168 Wis.2d 62, 67, 483 N.W.2d 803, *cert. denied,* —— U.S. ——, 113 S.Ct. 408, 121 L.Ed.2d 333 (1992)). The Beckmans maintain that because Kenny is still alive and voluntarily relinquished his rights with regard to Audriana at the time of her adoption,

he ceased to be her legal father at that time and, in turn, the Boggses could no longer be considered her grandparents.

The Beckmans also argue that while in *In re Adoption No. 92A41,* there was an order allowing grandparental visitation which existed prior to the adoption of the child, in the instant case, no rights had vested in the Boggses prior to Audriana's adoption by them. In addition, they maintain that the adoption created a new family structure, which should not be disrupted by outside parties. Such an intrusion, they say, would be unnecessary and would unduly interfere with the new relationship created between them and Audriana. They point out that this was not an issue in *In re Adoption No. 92A41* because the same familial relationship, in which the natural father, stepmother, and children were living together as a family, was in place both before and after the adoption and thus the visitation order was not found to alter the status quo that existed at the time of the adoption. Accordingly, there was no danger of the children in that case being confused or their lives being disturbed by the introduction of "strangers" into their lives; however, the Beckmans contend that this remains a concern in the instant case. *See In Interest of R.C.E.,* 535 So.2d 673 (Fla.1988).

The Beckmans also rely heavily on the case of *Acker v. Barnes,* 33 N.C.App. 750, 236 S.E.2d 715 (1977), which deals with a similar issue as the instant case. In *Acker,* the natural parents divorced. The mother remarried and her new husband adopted her children with the consent of their natural father. When the children's paternal grandmother and aunt petitioned the court for visitation with them, it was denied. Explaining the denial, the court cited a statute strikingly similar to § 5–308, which provides that upon a final decree of adoption, natural parents "shall be divested of all rights" with respect to the adopted child. The North Carolina Court of Appeals held that "[b]y adoption, the adopted child becomes legally the child of the adoptive parents and becomes legally a stranger to the bloodline of his natural parents." It further held: "So long as [the adoptive] parents retain lawful custody of their minor children, they retain the prerogative to deter-

mine with whom their children shall associate. Where, as here, the parents firmly resist any move by others seeking authority to visit the children, the courts will not compel the parents to allow such visitation." *Id.* 236 S.E.2d at 716.

The Beckmans' final contention is that if this were a confidential or closed adoption or one in which Audriana was to be placed with people outside her natural family, it is clear that the visitation would not have been permitted. The Court of Special Appeals has held that "under Maryland law, where the rights of the natural parents have been terminated and a child has been placed for confidential adoption, the courts of this state are not empowered to award visitation to the child's natural family over the objection of the ... adoptive parents." *L.F.M. v. Dep't of Social Serv.*, 67 Md.App. 379, 397, 507 A.2d 1151 (1986). The Beckmans contend that the holding in *L.F.M.* need not be limited to cases involving confidential adoptions. The Boggses strenuously disagree, arguing that the arrangement in the instant case cannot be considered a "closed" adoption in any respect and thus should not be so treated. They point out that all the people involved know each other and are in fact related to the adopted child by blood. They maintain that the rationale that underlies the decision to disallow visitation with natural family members in the case of an adoption by strangers clearly does not apply in the instant case.

The Boggses also argue that the adoption statute only addresses the effect of an adoption on the rights and obligations of adoptive parents, adopted children, and natural parents. They point out that there is no mention in § 5–308 of the impact that an adoption has on the legal rights of adopted children's other relatives, i.e., specifically on her natural grandparents. They also maintain that § 5–303(b)(3) should be read literally having as its intent only to protect adoptive parents from a future disturbance of their relationship with their adopted child *from her natural parents.* The Boggses believe that the legislature had no concern for the disruption that other blood relations of the child may have on the creation of a new family affiliation.

The Boggses also urge us to consider our decision in *Fairbanks* in which we held that there is nothing

"in § 9–102 to indicate in any way that a grandparent's right to petition for visitation with a child stems from a corresponding right enjoyed by the parent. In other words, the visitation rights of a grandparent are not derivative. Rather than functioning within a sub-set of parental visitation law, the grandparent's right to seek visitation under § 9–102 exists independently."

*Fairbanks, supra,* 330 Md. at 48–49, 622 A.2d 121 (citations omitted). They contend that if a grandparent's right to petition for visitation exists separately from a natural parent's rights, then the termination of the latter's rights, be it through death or consent to an adoption, must not cut off the rights of the former to seek visitation with a grandchild.

The Boggses final argument is that the revision of § 9–102 in 1993, which involved the legislature deleting the introductory phrase, "[a]t any time after the termination of a marriage by divorce, annulment, or death," in effect expanded the scope of the situations in which grandparents can seek visitation rights. According to the Boggses, the change was intended to eliminate even the suggestion that the provision was meant to only apply in instances where a marriage has been terminated.

## IV.

As we earlier observed, upon entry of a decree of adoption, "(1) the individual adopted is the child of the petitioner for all intents and purposes; and ... (2) each living natural parent ... is ... divested of all parental rights as to the individual adopted." § 5–308. Consequently, we conclude that when Audriana was adopted by the Beckmans, she became their daughter in the eyes of the law and her father, who consented to the adoption, was thereby dispossessed of all his legal rights with regard to her.[6] We hold, however, that this

---

**6.** This Court has held on numerous occasions that adoption completely severs all rights that a natural parent has with regard to the adopted

conclusion in no way impairs the Boggses' right to petition for visitation with their grandchild under § 9–102. As we said in *Fairbanks,* 330 Md. at 47–48, 622 A.2d 121, "[n]othing in the words of § 9–102 suggests that only exceptional circumstances, present as conditions precedent, may justify an award of visitation to grandparents." We further held:

"Nor is there anything in § 9–102 to indicate in any way that a grandparent's right to petition for visitation with a child stems from a corresponding right enjoyed by the parent. In other words, the visitation rights of a grandparent are not derivative. . . . Rather than functioning within a sub-set of parental visitation law, the grandparent's right to seek visitation under § 9–102 exists independently."

*Id.* at 48–49, 622 A.2d 121. Accordingly, we hold that the termination of Kenny's parental rights by reason of his daughter's adoption by the Beckmans does not result in a corresponding loss of the Boggses' independent grandparental rights under § 9–102 to petition for visitation. Of course, the Boggses' right to visitation with their grandchild is conditioned upon whether such contact is found to be in her best interest.

In enacting the adoption statute, the Legislature addressed some specific concerns it had over the role that natural families should play in the lives of their children once they have been adopted. While these considerations in no way impair a grandparent from petitioning for visitation under § 9–102, they should be carefully weighed in determining whether visitation would in fact be in the child's best interest in a particular case. The first of these considerations is that one of the primary goals of the adoption statute is to effectuate the establishment of new familial affiliations and to protect

---

child. *See, e.g., In re Adoption No. 10941, supra,* 335 Md. at 113, 642 A.2d 201 (quoting *Walker v. Gardner,* 221 Md. 280, 284, 157 A.2d 273 (1960)) ("Unlike awards of custody . . . adoption decrees cut the child off from the natural parent, who is made a legal stranger to his offspring."); *Logan v. Coup,* 238 Md. 253, 256–57, 208 A.2d 694 (1965) ("[A]doption decrees bring to an end the legal relationship of parent and child, which is not the case where custody, alone, is granted.").

adoptive parents "from ... future disturbance[s] of their relationship with [their new] child." § 5–303. Manifestly, stability is essential to a successful adoption and visitation by the natural relatives of a child after an adoption may undermine the adoptive parents' authority due to the potential for conflicting parental figures. Such contact may also lead to a division of loyalty, causing the newly adopted child to feel torn between his or her old and new families. Furthermore, as with any parent-child relationship, it is vitally important to recognize the strong interest of the adoptive parents in deciding with whom their adopted children should interact.

That grandparents play an entirely different role in a child's life than parents is, we think, very clear; their love and affection for the child complements, rather than supplants, the position of the parent in the child's life. See Fairbanks, supra, 330 Md. at 49, 622 A.2d 121 (stating that "[c]ommon experience dictates that visits with grandparents often offer benefits to children which cannot be derived from any other relationship."). See also In re Marriage of Herreras, 159 Ariz. 511, 768 P.2d 673 (1989); Mimkon v. Ford, 66 N.J. 426, 332 A.2d 199, 203–05 (1975); Graziano v. Davis, 50 Ohio App.2d 83, 361 N.E.2d 525 (1976).

Finally, in most adoptions, confidentiality is an important consideration for both natural and adoptive parents. Section 5–329(b) states: "The court may not order opened for inspection any part of a record that contains any information that reveals the location or identity of the [adopted] individual's natural parents." While the scenario presented in the instant case is far from a closed adoption, we agree with the Beckmans that the rationale set forth in L.F.M., supra, 67 Md.App. at 397, 507 A.2d 1151, for disallowing contested visitation following a confidential adoption may well apply in certain cases involving open or intrafamily adoptions. We conclude, however, that the determination of whether this is true in a particular instance must be made on a case-by-case basis with the court being guided solely by what is in the best interest of the child.

Because we have determined that the Boggses retain the right to petition for reasonable visitation with their granddaughter under § 9–102 following her adoption by the Beckmans, the final matter that we must address in this case is whether the trial court properly exercised its discretion in deciding that such visitation would be in Audriana's best interest. The Beckmans, of course, argue that it did not; claiming that the evidence presented at trial demonstrates that such visitation would in fact be detrimental to the child. They also contend that the lower court did not properly assess all the relevant factors and circumstances in making its determination as to what would be in Audriana's best interest, suggesting that the court was required to, but did not, specifically address each of the factors enumerated in *Fairbanks* in making its visitation decision.

As we have said, determinations concerning visitation are within the sound discretion of the trial court as it is in the best position to assess the import of the particular facts of the case and to observe the demeanor and credibility of the witnesses.[7] *See Petrini, supra,* 336 Md. at 470, 648 A.2d 1016. The paramount consideration must always be that which best fulfills the needs of the child. *Id.* at 468, 648 A.2d 1016. The definition of a child's best interest is often an elusive one. *Id.* at 468–69, 648 A.2d 1016. *See also Fairbanks, supra,* 330 Md. at 49, 622 A.2d 121. We have set forth certain relevant criteria that a court should assess, in their totality, when making decisions concerning the propriety of grandparent visitation in a given case. *Id.* at 50, 622 A.2d 121. The factors enumerated in *Fairbanks* are guidelines; they were meant to be illustrative of what should be considered and were not intended as absolutes. *Id.* The standard of review in these cases is whether the trial court abused its discretion in making its visitation determination. *See Petrini, supra,* 336 Md. at 470, 648 A.2d 1016. *See also Davis v. Davis,* 280 Md. 119, 125, 372 A.2d 231 (1977), *cert. denied,* 434 U.S. 939, 98 S.Ct. 430, 54

---

7. Visitation, which is considered to be a form of temporary custody, and custody determinations are generally governed by the same principles.

L.Ed.2d 299 (1977), *reh'g denied*, 434 U.S. 1025, 98 S.Ct. 754, 54 L.Ed.2d 774 (1978). In establishing this standard, we held that "when the appellate court views the ultimate conclusion of the chancellor founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the chancellor's decision should be disturbed only if there has been a clear abuse of discretion." *Petrini, supra,* 336 Md. at 470, 648 A.2d 1016 (quoting *Davis, supra,* 280 Md. at 126, 372 A.2d 231).

While the trial court in this case did not expressly address each of the factors enumerated in *Fairbanks* in making its visitation decision, it is clear from the court's findings that it evaluated the evidence presented at trial with Audriana's best interest foremost in mind. It found that while there was testimony from Audriana's natural father that he had had an unhappy childhood as a result of his mother's treatment of him and that he feared that his daughter would be exposed to the same family atmosphere if his mother was allowed to visit with her, no evidence was presented at trial that indicated that the Boggses were "inattentive or harmful or unpleasant or uncaring" towards Audriana or that they would be unwilling or unable to provide adequate supervision and an appropriate environment for her during periods of visitation. The court further concluded that it believed that "it is fundamentally in the best interests of any child to have contacts with his or her grandparents." In structuring its visitation award, the court took into consideration the fact that Audriana has had little contact with the Boggses for most of her life. We conclude that the court's determination with regard to visitation in this case was based upon factual findings made pursuant to a review of all the evidence presented at trial, the court's assessment of the credibility of the witnesses, and extensive deliberation concerning Audriana's best interest. We thus find no abuse of the court's discretion.

*JUDGMENT OF THE CIRCUIT COURT FOR ALLEGANY COUNTY AFFIRMED, WITH COSTS.*

BELL, J., concurs in the result only.