996 A.2d 939

Jason BRANDENBURG, et ux.

v.

David LaBARRE, et ux.

No. 2080, Sept. Term, 2009.

Court of Special Appeals of Maryland.

June 2, 2010.

Peter P. McDowell of Towson, MD, for appellant.

Roanne Handler (Schlachman, Belsky & Weiner PA, on the brief), Baltimore, MD, for appellee.

Panel: DEBORAH S. EYLER, GRAEFF and JAMES P. SALMON (Retired, Specially Assigned), JJ.

DEBORAH S. EYLER, J.

Jason and Nicole Brandenburg, the appellants, challenge an order of the Circuit Court for Anne Arundel County awarding Laura and David LaBarre, the appellees, visitation with the appellants' four minor children.[1] The appellees are the paternal grandparents of the children.[2] The appellants pose two questions for our review, which we have combined and rephrased as one:

Did the circuit court err in finding that exceptional circumstances existed justifying an award of grandparental visitation rights?

We answer this question in the affirmative and, accordingly, shall reverse the visitation order.

---

1. For ease of discussion, we shall refer to the parties by their first names when identifying them individually.

2. Laura is Jason's mother and David is his stepfather.

## FACTS AND PROCEEDINGS

Jason and Nicole were married on June 2, 1998. They have four children: Tyler, born July 7, 1998 (age 11); Zachary, born September 14, 2001 (age 8); Matthew, born August 9, 2004 (age 5); and Jordan, born May 18, 2007 (age 3). They currently reside in Glen Burnie.[3]

At the time of the trial in this matter, the LaBarres had been married for just over 30 years. Jason was almost two years old when they married. By all accounts, David has been the only father figure in Jason's life. The LaBarres also reside in Glen Burnie.

At all relevant times, Jason was employed full-time with BGE Home. From 2004 until May of 2006, Nicole was employed on a part-time basis for various employers. In June of 2006, she began working full time for SunTrust Bank in Annapolis. She continued to work there until February of 2008.[4]

Laura does not work due to a neck injury she sustained on the job in 1999. David works full time for a roofing and siding company. He also works many Saturdays.

From 2004 until June of 2006, Laura and David provided occasional care for the children, depending on the Brandenburgs' needs, and spent time with them on weekends and holidays when possible. For an 18–month period between June of 2006 and February of 2008, Laura provided free childcare for the children in her home on a daily basis, with the exception of 8 weeks in the summer of 2007 following Jordan's birth. During that time period, Matthew and Jordan also spent Sunday nights at the LaBarre house,[5] so that Nicole could attend an early Monday morning meeting without hav-

---

3. The Brandenburgs resided in Parkville until June of 2006.

4. Initially, Nicole only worked from about 8:30 a.m. until 3:00 p.m. She later began working until 5:00 p.m.

5. Jordan was born in May of 2007 and was in Laura's daily care for a seven-month period following Nicole's maternity leave.

ing to wake them.[6] David assisted in caring for the children on the occasions when they were at his house in the evenings and on weekends.

In February of 2008, the parties became involved in a personal dispute unrelated to the children. In the aftermath of this fight, David told Jason that Laura would no longer provide free childcare. Thereafter, the Brandenburgs cut off all contact between their children and the LaBarres. At that time, Tyler was 9, Zachary was 6, Matthew was 3, and Jordan was almost 9 months old.

On April 23, 2008, the LaBarres filed a complaint to establish visitation rights. They alleged that they had provided daycare for their grandchildren since 2004, including regular overnight care; that, "in virtually all respects, [they] have served as parent figures to all of these grandchildren for many years"; and that all four children were "extremely bonded" to them, thus "creating exceptional circumstances." They sought an order granting them a schedule of visitation (not specified) with the children.

The Brandenburgs answered the complaint and filed a counterclaim for abuse of process.

On June 16 and 17 and August 10, 2009, the case was tried to the court.[7] Laura and David testified on their own behalf and called 13 witnesses to testify as to their character and the nature of their relationship with the grandchildren.[8] Overall, the evidence presented by the LaBarres supported their allegation that they had cared for their grandchildren on a nearly

---

6. Tyler and Zachary did not spend the night because they were in school from September through June. One of the Brandenburgs would drop them at the bus stop in the mornings and Laura would pick them up in the afternoon.

7. All of the evidence was introduced in June. Closing arguments were presented in August.

8. The witnesses included Jason's younger brother, Ryan LaBarre; David's sister; Laura's mother and sister; and various friends and neighbors of the LaBarres. The LaBarres also called David's father on rebuttal.

continuous basis from 2004 until 2008, including weekly overnight care for several of the children. The testimony also supported their allegation that they had had a loving, bonded relationship with the grandchildren.

Jason and Nicole testified on their own behalf and called 10 witnesses to testify about their character, the character of the LaBarres, and the then-current well-being of the children.[9] Their evidence supported their claim that Laura had provided daycare continuously for the 18–month period beginning in June of 2006, but that, aside from that period, the children's interactions with their grandparents were occasional. There also was testimony that the LaBarres were habitual marijuana smokers; that David regularly used alcohol; that Laura suffered from bipolar disorder, but was not currently taking medication for the condition; and that the LaBarres physically disciplined the grandchildren against the wishes of their parents. Finally, there was testimony that the four children were thriving, both academically and socially, in the approximately 16 months since they had ceased all contact with the LaBarres.

At the conclusion of testimony and argument, the trial court held the matter *sub curia.*

On October 28, 2009, the circuit court entered an order granting the LaBarres "overnight unsupervised visitation" with the four children on the third weekend of every month from 5 p.m. on Friday until 7:00 p.m. on Saturday. In addition, the LaBarres were to have "one full and continuous week of unsupervised visitation" with the children each summer. Finally, the order directed the LaBarres to "refrain from any use of alcohol or illegal substances during said visits" and to "respect and abide by any reasonable instructions given

---

**9.** The witnesses included Nicole's parents and aunt; David's mother and brother; neighbors of the Brandenburgs; and neighbors of the LaBarres.

There was discussion of calling Tyler as a witness, but in the interim between the testimony in June and the continued hearing date in August, the Brandenburgs apparently decided not to do so.

to them by [the Brandenburgs] pertaining to supervision and care of the [ ] children."

In an accompanying memorandum opinion, the circuit court made the following relevant findings of fact and conclusions of law. After summarizing the evidence presented by each side, as discussed above, the trial court found the evidence presented by the LaBarres "to be highly credible" and the evidence presented by the Brandenburgs "to be lacking in credibility." The court found that the evidence showed that the LaBarres were "essentially good people with some human flaws that, it must be noted, have not had a negative effect upon [their] relationship with the four children."

The trial judge found that David is a "stern man with a strong personality" who "may on occasion rub certain people the wrong way," but rejected evidence presented by the Brandenburgs that he ever had abused the minor children. As to Laura, the court found that she indeed suffers from bipolar disorder, by her own admission, but concluded that the evidence was such that "her condition is well under control and has in no way diminished her capacity as a caregiver."

The court found that both Laura and David are occasional marijuana users, again by their own admission. It found, however, that they had "assiduously avoided using marijuana in any manner that could affect their ability to provide care for and supervision over the children in question" and that they similarly would not allow it to do so in the future. Finally, the court noted that the LaBarres' "alleged character flaws" had not seemed to bother the Brandenburgs when the children had been in their daily care.

Citing the Maryland Grandparents Visitation Statute ("GVS"), Md.Code (2006 Repl. Vol., 2009 Supp.), Section 9–102 of the Family Law Article ("FL"), and *Koshko v. Haining*, 398 Md. 404, 921 A.2d 171 (2007), the court explained that a threshold showing of either parental unfitness or exceptional circumstances is required before grandparental visitation can be ordered. As parental unfitness was not alleged, it considered only whether exceptional circumstances had been demon-

strated.  The court emphasized that this was an " 'inherently fact-specific analysis,' " quoting *Aumiller v. Aumiller*, 183 Md.App. 71, 81, 959 A.2d 849 (2008), to be determined on a case-by-case basis, but requiring a showing of " 'significant deleterious effect,' " *id.* at 84, 959 A.2d 849, on the minor children caused by the lack of grandparental visitation.

Applying the law to the facts before it, the court opined as follows:

> In the instant case, it belies both commonsense and a decent regard for the importance of human relationships to suggest, as the [Brandenburgs] do, that the four children in question suffered no "significant deleterious effect" when, as the result of a bitter dispute between their parents and paternal grandparents, they were swiftly and abruptly denied any contact with close and loving relatives whom they had grown accustomed to seeing, for hours at a time, on a daily basis over a period of several years.  And it belies commonsense and a decent regard for the importance of human relationships to suggest that the [Brandenburgs'] four children are not continuing to suffer harm as, at the time of this opinion, they have been denied contact with the [LaBarres] for an uninterrupted period of nearly two years. The [LaBarres] are not, as the [Brandenburgs] claim, the proverbial grandparents of benign cliche' who, on occasion, drop by to take the grandkids to the zoo.  To the contrary, as we have seen, the [LaBarres] were, along with the [Brandenburgs], the essential and ever-present adult figures in the lives of all four children.... [T]hree of the four children had been cared for by the [LaBarres], on a daily basis during vital formative years, for at least half their lives at the time they were suddenly and summarily deprived of that care.

The court rejected the Brandenburgs' assertion that the LaBarres needed to present direct evidence of harm to the minor children, concluding that this would be impossible where, as here, they had been denied contact with the children.  It emphasized that it was the court's role, as the fact finder, to draw reasonable inferences from the facts presented

and that it was a "commonsense inference[ ] from the particular facts of the instant case" that significant deleterious effect had resulted to the children.

Finally, despite its earlier recognition that the Brandenburgs' parental fitness was not challenged, the trial court concluded that, under the facts presented, the presumption that fit parents act in the best interests of their children had been rebutted. It found that the Brandenburgs "allowed a dispute among adults to overpower consideration of their children[']s[ ] best interests."

Having concluded that the threshold of exceptional circumstances had been met, the court turned to the best interests analysis. After considering the factors set forth in *Fairbanks v. McCarter*, 330 Md. 39, 50, 622 A.2d 121 (1993), *overruled in part by Koshko, supra*, 398 Md. at 445, 921 A.2d 171,[10] the court concluded that it was in the best interests of the minor children to have visitation with their grandparents. Finally, the court denied the Brandenburgs' counterclaim for abuse of process.[11]

The Brandenburgs noted a timely appeal from the visitation order and moved for a stay of the order pending resolution of the instant appeal. The circuit court granted the motion for stay.

---

**10.** The *Fairbanks* Court proposed a non-exclusive list of factors for the trial court to consider when evaluating the best interests of a child under the GVS, which included:

[T]he nature and stability of the child's relationships with its parents; the nature and substantiality of the relationship between the child and the grandparent, taking into account frequency of contact, regularity of contact, and amount of time spent together; the potential benefits and detriments to the child in granting the visitation order; the effect, if any, grandparental visitation would have on the child's attachment to its nuclear family; the physical and emotional health of the adults involved; and the stability of the child's living and schooling arrangements.

330 Md. at 50, 622 A.2d 121.

**11.** The counterclaim is not at issue in this appeal.

## DISCUSSION

The Brandenburgs, as the undisputedly fit parents of the minor children, "are invested with the fundamental right of parents generally to direct and control the upbringing of their children." *Koshko, supra,* 398 Md. at 422–23, 921 A.2d 171. "This liberty interest provides the constitutional context which looms over any judicial rumination on the question of custody or visitation." *Id.* at 423, 921 A.2d 171. In the instant case, the trial court concluded, based on "commonsense inferences" drawn from its factual finding that the LaBarres had been "essential and ever-present adult figures in the lives of all four children," that exceptional circumstances existed permitting the court to substitute its judgment of the best interests of the minor children for that of the parents. For the reasons that follow, we conclude that this was error and that the visitation order must be vacated.

▮▮ We recently explained that
[o]rders related to visitation or custody are generally within the sound discretion of the trial court, not to be disturbed unless there has been a clear abuse of discretion. *See Walter v. Gunter,* 367 Md. 386, 391–92, 788 A.2d 609 (2002); *Beckman v. Boggs,* 337 Md. 688, 703, 655 A.2d 901 (1995). However, where the order involves an interpretation and application of statutory and case law, the appellate court must determine whether the circuit court's conclusions are "legally correct" under a *de novo* standard of review. *Walter,* 367 Md. at 391–92, 788 A.2d 609.
*Barrett v. Ayres,* 186 Md.App. 1, 10, 972 A.2d 905 (2009). The instant order involved the application of the law of third-party visitation to the facts and, thus, we review the ultimate order *de novo.*

▮▮ We begin with some background. Parents and grand-parents do not stand on the same legal footing with respect to visitation. A parent's right to visitation is rooted in a fundamental constitutional liberty interest, while any right to visitation possessed by grandparents "is solely of statutory origin." *Koshko, supra,* 398 Md. at 423, 921 A.2d 171. Maryland's

GVS provides that "[a]n equity court may: (1) consider a petition for reasonable visitation of a grandchild by a grandparent; and (2) if the court finds it to be in the best interests of the child, grant visitation rights to the grandparent." [12] FL § 9–102.

In 2000, the United States Supreme Court decided *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), calling into question the constitutionality of the GVS. In *Troxel*, a plurality of the Court held that application of a grandparental visitation statute in a manner that accords no deference to the decision of a fit parent to deny or limit visitation is unconstitutional because it infringes upon the parent's fundamental right, under the Due Process Clause of the 14th Amendment, to make decisions about the care, custody, and control of his (or her) children.

Post-*Troxel*, in *Koshko, supra*, our Court of Appeals was presented with a direct challenge to the constitutionality of the GVS. That case, like the instant case, involved a married couple—the Koshkos—who opposed visitation between their three minor children [13] and the children's maternal grandparents—the Hainings. Like the situation in the case at bar, a bitter personal dispute unrelated to the children was the impetus for the Koshkos to cut off contact and for the Hainings to petition for visitation pursuant to the GVS. After a trial, the circuit court found that it was in the best interests of the minor children to have visitation with their grandparents and awarded the Hainings a four-hour visit every 45 days and quarterly overnight visits. The Koshkos appealed.

---

**12.** As originally enacted, in 1981, the GVS only permitted petitions for visitation after dissolution of the marriage of the minor child(ren)'s parents. Ch. 276 of the Acts of 1. This restriction was removed in 1993 amendments to the statute. Ch. 252 of the Acts of 1993. *See also Koshko v. Haining*, 168 Md.App. 556, 568–69, 897 A.2d 866 (2006) (discussing history of the GVS).

**13.** The oldest child was Andrea Koshko's biological daughter and Glen Koshko's stepdaughter.

This Court held that the GVS was not facially invalid because it could be "supplemented by judicial interpretation with an inferred presumption that parental decisions regarding their children are valid," thus reconciling the decision with *Troxel. Koshko, supra,* 398 Md. at 425, 921 A.2d 171 (summarizing this Court's holding). We also held that, consistent with a line of cases distinguishing third-party visitation disputes from third-party custody disputes, there was no need for an equity court to make a threshold finding of parental unfitness or exceptional circumstances before awarding visitation rights to grandparents under the GVS. *See Koshko, supra,* 168 Md.App. at 577–84, 897 A.2d 866. Rather, we looked to the decision in *Fairbanks, supra,* which set forth factors relevant to a best interests analysis with respect to grandparental visitation.

The Court of Appeals granted *certiorari* and affirmed in part and reversed in part this Court's decision. After an extensive review of third-party custody and visitation cases in Maryland and the *Troxel* decision, the Court of Appeals turned to the GVS. It agreed with this Court that the GVS was facially valid under *Troxel* by application of the presumption in favor of fit parents, discussed *supra.* It concluded, however, that even with this presumption, the GVS still ran afoul of the due process protections afforded by Article 24 of the Maryland Declaration of Rights because it worked an unconstitutional intrusion upon the liberty rights of fit parents to control access to their children.

The Court explained that "visitation is a species of custody, albeit for a more limited duration." *Koshko, supra,* 398 Md. at 429, 921 A.2d 171 (citing *Beckman, supra,* 337 Md. at 703 n. 7, 655 A.2d 901). While previous cases had drawn a sharp distinction between third-party visitation and third-party custody in terms of the intrusion on parental autonomy, the Court emphasized that the "lesser *degree* of intrusion" did not warrant a lower threshold of constitutional scrutiny. *Id.* at 430, 921 A.2d 171 (emphasis in original). When it applied strict scrutiny to the statute, the Court concluded that the "parental presumption we engrafted onto the GVS saves it from *per se*

invalidation under *Troxel*, but it is not sufficient, by itself, to preserve the constitutionality of the statute." *Id.* at 439, 921 A.2d 171. The Court held that it would interpret the GVS to require "a threshold showing of either parental unfitness or exceptional circumstances indicating that the lack of grandparental visitation has a significant deleterious effect upon the children who are the subject of the petition." *Id.* at 441, 921 A.2d 171 (footnote omitted). This is the same threshold showing already applicable in the third-party custody setting. *See, e.g. McDermott v. Dougherty*, 385 Md. 320, 325, 869 A.2d 751 (2005); *Ross v. Hoffman*, 280 Md. 172, 178–79, 372 A.2d 582 (1977).

The Court remanded the case to the circuit court for further proceedings to determine if that threshold showing had been made. It noted that the burden would be on the grandparents to make a *prima facie* showing of parental unfitness or exceptional circumstances and, if so, then to "tip the scales of the best interests balancing test in their favor." *Koshko, supra*, 398 Md. at 445 n. 23, 921 A.2d 171.

In one of the two reported decisions under the GVS since *Koshko*, we declined to further define the term "exceptional circumstances" in the context of the GVS. In *Aumiller, supra*, 183 Md.App. at 71, 959 A.2d 849, the circuit court denied visitation rights to paternal grandparents of two minor children.[14] The children's father was deceased and the children's mother opposed visitation. The paternal grandparents had had very little contact with the grandchildren for several years prior to the visitation petition. The circuit court concluded that the grandparents had not produced legally sufficient evidence of exceptional circumstances. We agreed that there was not any evidence of current or future harm to the children caused by the lack of visitation and, thus, affirmed the order of the circuit court.

---

14. The circuit court initially had awarded visitation rights to the grandparents, but *Koshko* was decided while the appeal of the visitation order was pending. This Court remanded the case to the circuit court for further proceedings in light of *Koshko*.

We explained that "[t]he factors used to determine the existence of exceptional circumstances" have been well established in the context of third-party custody disputes, *id.* at 80, 959 A.2d 849, although they are not always particularly relevant or helpful in the context of visitation disputes.[15] We declined, however, to set forth additional factors relevant to the visitation context, emphasizing instead that each case must be decided on its own facts.

In response to the grandparents' argument that the trial court had failed to consider future detriment to the children caused by lack of grandparental visitation, we opined that such a finding "must be based on solid evidence in the record, and speculation will not suffice." *Id.* at 81–82, 959 A.2d 849. Quoting *McDermott, supra,* a third-party custody case, we stated that " 'it is a weighty task ... for a third party ... to demonstrate "exceptional circumstances" which overcome the presumption that a parent acts in the best interest of his or her children and which overcome the constitutional right of a parent to raise his or her own children.' " *Id.* at 82, 959 A.2d 849 (quoting 385 Md. at 424, 869 A.2d 751).

We also rejected outright the grandparents' contention that the mother's refusal to allow any contact between the children and the grandparents itself amounted to exceptional circumstances, concluding that such an interpretation of "exceptional circumstances" would eviscerate the holding in *Koshko.* While we sympathized with the plight of grandparents denied any access to their grandchildren, we explained that who a parent "allows her children to associate with [is] the type of matter[ ] within the fundamental rights of parents that *Koshko*

---

**15.** These factors were first enunciated in *Ross, supra,* 280 Md. at 191, 372 A.2d 582:

> [T]he length of time the child has been away from the biological parent, the age of the child when care was assumed by the third party, the possible emotional effect on the child of a change of custody, the period of time which elapsed before the parent sought to reclaim the child, the nature and strength of the ties between the child and the third party custodian, the intensity and genuineness of the parent's desire to have the child, the stability and certainty as to the child's future in the custody of the parent.

painstakingly sought to protect." *Id.* at 82–83, 959 A.2d 849. Finally, we considered the type of evidence of harm that grandparents might present to satisfy the exceptional circumstances threshold, concluding that "[e]xpert testimony may be desirable and, frequently, may be necessary" to meet the burden imposed in *Koshko. Id.* at 85, 959 A.2d 849.[16]

■ We return to the instant case. On the evidence adduced, the trial court erred as a matter of law in concluding that the LaBarres proved the existence of exceptional circumstances necessary to overcome the Brandenburgs' right to control access to their children. Accepting the trial judge's factual findings, the sum of the evidence he deemed credible was that the children were cared for by the LaBarres on a daily basis for several years and that the children frequently spent the night at their house as well. The two oldest boys— Tyler and Zachary—were in school most of the day during the week, but were picked up after school by Laura and also frequently spent the weekend at the LaBarre house. The two youngest children were in full-time care with Laura during the week. According to the court, the LaBarres were "everpresent adult figures in the lives of all four children."

As the trial court conceded, however, there was no evidence of harm to the children caused by the cessation or absence of visitation. The LaBarres did not question any of their witnesses on the subject of the current condition of the children, nor did they cross-examine the Brandenburgs' witnesses as to this subject. They also did not present any expert testimony with regard to the impact on the children of the cessation of contact with the LaBarres.

While we, like the trial judge, appreciate the difficulty of establishing "significant deleterious effect" upon children when there is no opportunity for contact, we cannot presume

---

**16.** In the second reported decision under the GVS since *Koshko, Barrett, supra,* 186 Md.App. at 1, 972 A.2d 905, we held that the desire of a fit parent to modify an existing grandparental visitation order constituted a material change of circumstances and shifted the burden to the grandparents to show exceptional circumstances.

such an effect when, as here, no evidence of harm was adduced. The only evidence at trial with respect to harm, *vel non*, supported the Brandenburgs' assertion that the children were thriving. Numerous witnesses for the Brandenburgs testified to this effect. Although the trial judge was free to reject this evidence, he was not free to speculate about the children's actual condition. To be sure, if there had been some facts in the record concerning the condition of the children after contact ceased, reasonable inferences could have been drawn from those facts to conclude (if the facts supported it) that they had suffered or were suffering harm by the cessation of contact. The trial court was not permitted to draw an inference from the mere amount of time the children once had spent with the grandparents and the generally loving and bonded relationship they had had with them that the cessation of contact between the appellees and the children had harmed the children. The LaBarres bore the ultimate burden of showing harm and they failed to present the court with facts from which it could draw a reasonable inference of significant deleterious effect.[17]

The bar for exceptional circumstances is high precisely because the circuit court should not sit as an arbiter in disputes between fit parents and grandparents over whether visitation may occur and how often. In the instant case, the fit parents chose to end contact between their children and the paternal grandparents because of a personal dispute between the parties.[18] Although the trial court may, and did, disagree with this choice, it must defer to the parents' wishes absent

---

17. We also note that the trial court, aside from observing the particularly close relationship purportedly shared between Matthew and the LaBarres, failed to make any distinction between the children. Jordan, for instance, was just nine months old when visitation ceased. The inference of harm drawn with respect to the older children is even more speculative with respect to a child of this age.

18. The Brandenburgs asserted that the decision to end contact was caused by numerous factors, including the LaBarres' alleged use of physical discipline, their drug use, and the nutritional choices they made while the children were in their care. The trial court found this testimony to lack credibility, however.

proof of significant deleterious effect caused by the cessation of visitation. No such proof was offered. For all of these reasons, we shall reverse the visitation order and remand for entry of an order denying the petition for visitation.

**ORDER OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY REVERSED. COSTS TO BE PAID BY THE APPELLEES.**