**FAMILY LAW - SIBLING VISITATION - FINDING OF PARENTAL UNFITNESS OR EXCEPTIONAL CIRCUMSTANCES MUST PRECEDE BEST INTERESTS INQUIRY**

Before a court may order that a sibling, whether full, half, or CINA, have visitation with another sibling, contrary to that sibling's parent's wishes, the court must make a threshold finding of parental unfitness or exceptional circumstances indicating that a lack of sibling visitation will have a substantial deleterious effect on the sibling for whom visitation is sought.

Circuit Court for Carroll County
Case No. 06-I-10-005291
Argued: October 3, 2013

IN THE COURT OF APPEALS OF
MARYLAND

No.  15

September Term, 2013

*In re: Victoria C.*

Barbera, C.J.
Harrell
Battaglia
Greene
Adkins
McDonald
Rodowsky, Lawrence F.
 (Retired, Specially
      Assigned),

JJ.

Opinion by Battaglia, J.
Greene and Adkins, JJ., dissent.

Filed: March 27, 2014

In the present case we are called upon to address the applicability of our holding in *Koshko v. Haining*, 398 Md. 404, 441, 921 A.2d 171, 192-93 (2007), in which we recognized that parents of a minor child have the fundamental right to make decisions regarding the care, custody, and control over their child such that third parties seeking visitation contrary to the parents' wishes must make a *prima facie* showing that the absence of such visitation would have a "significant deleterious effect" on the child, i.e., "exceptional circumstances."[1] Our *Koshko* decision followed the United States Supreme Court's ruling in *Troxel v. Granville,* 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), in which the Court ruled as unconstitutional a Washington statute, which permitted any third party to seek visitation with a minor child as long as a trial court determined that it was in the child's best interest, because the statute afforded no presumption in favor of parental decision-making.

Today we address the ability of Victoria C., born on August 25, 1993, to visit with her half-siblings, Lance and Evan, over the objections of their biological father, George C., from whom Victoria C. is estranged, so much so that Victoria C. had been declared a Child in Need of Assistance, and their biological mother, Kieran C. After the Circuit Court sitting as a Juvenile Court determined that supervised visitation by Victoria C. with Lance and Evan was appropriate upon such recommendation by a master, the Court of Special Appeals

---

[1] In *Koshko v. Haining*, 398 Md. 404, 441, 921 A.2d 171, 192-93 (2007), we also referred to parental unfitness as a basis that would justify overriding a parental decision with respect to visitation. Parental unfitness is not in issue in the present case, so we do not address it.

reversed, holding that Victoria C. had not proven exceptional circumstances within our

*Koshko* dictates. Victoria C. petitioned for certiorari, which we granted, to resolve three

questions, which we have consolidated into one and rephrased for clarity:[2]

> Does the analytical framework established by *Koshko v. Haining*, 398 Md.
> 404, 921 A.2d 171 (2007), which requires a third party seeking visitation of a
> minor child, contrary to the parents' wishes, to make a *prima facie* showing of
> exceptional circumstances before a court may award visitation to a third party,
> apply when a woman, previously adjudicated a Child in Need of Assistance,
> seeks visitation with her siblings?

We will respond yes and explain.

Victoria C. was declared a Child in Need of Assistance[3] in April of 2010 after her

---

[2] In her Petition for Certiorari, Victoria presented the following three issues for review:

1. It is desirable and in the public interest to treat children in need of assistance under the best interest standard and to diverge from this standard, regardless of age, is contrary to the statutory authority granted to the juvenile court[.]
2. It is desirable and in the public interest to differentiate a sibling from a grandparent as in the decision in *Koshko v. Haining*, 398 Md. 404 (2007) and the decision in *In re Tamara R.*, 136 Md. App. 236 (2000) should remain the Maryland standard for sibling visitation.
3. It is desirable and in the public interest to limit exceptions as well as appeals to those delineated matters specifically enumerated per Maryland Rule 11-111 and review per the clearly erroneous standard.

[3] Section 3–801(f) of the Courts and Judicial Proceedings Article, Md. Code (1974, 2013 Repl. Vol.) defines a Child in Need of Assistance as:

(f) *Child in need of assistance.* - "Child in need of assistance" means a child who requires court intervention because:
        (1) The child has been abused, has been neglected, has a developmental disability, or has a mental disorder; and

(continued...)

2

father, George C., would not allow her to return to the home that he shared with his wife Kieran C., and their two children Lance, then four-years old, and Evan, then two-years old. After Victoria C.'s mother committed suicide in 2003, she lived with her father, but in 2009, she was sent to live with her aunt in Texas, after the Department of Social Services investigated an allegation of abuse against George C.[4]  Victoria C.'s aunt sent her back to Maryland one year later, and George C. did not permit Victoria C. to return to his home. Instead, he made arrangements for Victoria C. to stay in a local hotel; Victoria C., however, ran away and was ultimately placed by the Department of Juvenile Services in the San Mar Children's home, located in Boonsboro, Maryland.

The Carroll County Department of Social Services, thereafter, filed a Petition to declare Victoria C. a Child in Need of Assistance (CINA), which was granted by the Circuit Court sitting as a Juvenile Court for Carroll County.  The court adjudicated Victoria C. a CINA after determining that continued residence in George C.'s home was contrary to Victoria C.'s welfare:

---

(...continued)
> (2) The child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's needs

[4]  Victoria C.'s school had reported suspected physical abuse to the Department of Social Services after Victoria C. arrived at school with bruising in her left eye area; ultimately, the Department's investigation resulted in a finding of "indicated," which Section 5-701(m) of the Family Law Article, Md. Code (1999, 2012 Repl. Vol.) defines as a "finding that there is credible evidence, which has not been satisfactorily refuted, that abuse, neglect, or sexual abuse did occur."  Ultimately the determination of Victoria C.'s status as a Child in Need of Assistance was based upon the inability to return her to the father's home.

[T]he Respondent's mother is deceased and her father is unwilling to have her at this time due to the past history he has with respect to her (prior child protective services investigation resulted in an "indicated" finding resulting in the father's sending Respondent to Texas to live with a maternal aunt.). The child was with the aunt from approximately February 23, 2009 until March 5, 2010, at which time the child was returned to Maryland. The father attempted to house the child at a local hotel, but she ran away and was ultimately placed at San Mar's Children's home after intervention by the Department of Juvenile Services. Further information was detailed on the record.

The court further finds,

That the evidence presented sustained a finding that because of the emergent nature of the situation, such reasonable efforts to prevent or eliminate the need for removal of the child could not be made; the emergent nature that existed is that: See above. The child had been housed at a local hotel from which she ran away and then was reported as a runaway. She was referred to the Department of Juvenile Services; and the intervention of the Department of Social Services became necessary due to prior incidents of alleged abuse by the Respondent's father; the Respondent's mother is deceased.

Victoria C. remained in the custody of the Carroll County Department of Social Services for placement in a therapeutic group home, the Nicodemus House, and eventually went into foster care. George C.'s parental rights over Victoria C. were not terminated; the permanency plan[5] reflected a goal of reunification with George C.

---

[5] Section 5-525(f)(1) of the Family Law Article, Md. Code (1999, 2012 Repl. Vol.) states in relevant part:

(f) *Development of a permanency plan.* – (1) In developing a permanency plan for a child in an out-of-home placement, the local department shall give primary consideration to the best interests of the child, including consideration of both in-State and out-of-state placements.

The Circuit Court sitting as a Juvenile Court conducted periodic review hearings,[6]

during the first of which Victoria asked to visit with Lance and Evan, the minor children of

George C. and Kieran C., who had been married in 2005.  With respect to her visitation

request, the master assigned to the case made the following findings:

> The Respondent would like to have contact with her half-siblings.
> Visitation has not occurred with the Respondent's father thus far. Other
> information regarding compliance with Court Orders was detailed on the
> record.  According to the Respondent, the therapy sessions had conflicted with
> her work schedule, but that issue is being resolved.  She would like to see her
> siblings.
> The Respondent's father stated that there is not a significant
> relationship with the Respondent at this time and does not believe it would be
> appropriate to have contact with the younger half-siblings at this time.
> Otherwise, he will cooperate with the other Court's directives.

Based on these findings, the master's recommendation was that "visitation between the

_____

[6] Section 3-823(h) of the Courts and Judicial Proceedings Article, Md. Code (1974,
2013 Repl. Vol.), provides that the Juvenile Court must conduct periodic review hearings:

> (h)  *Periodic reviews*.—(1)(i)  Except   as   provided   in
> subparagraphs (ii) and (iii) of this paragraph, the court shall
> conduct a hearing to review the permanency plan at least every
> 6 months  until  commitment  is  rescinded  or  a  voluntary
> placement is terminated.
> (ii) The court shall conduct a review hearing every 12
> months  after  the  court  determines  that  the  child  shall  be
> continued in out-of-home placement with a specific caregiver
> who agrees to care for the child on a permanent basis.
> (iii) 1. Unless the court finds good cause, a case shall be
> terminated after the court grants custody and guardianship of the
> child to a relative or other individual.
> 2. If the court finds good cause not to terminate a case,
> the court shall conduct a review hearing every 12 months until
> the case is terminated. . . .

Respondent and her half-siblings shall occur only if and when therapeutically indicated."

George C., thereafter, filed exceptions to the master's recommendation.[7] Ultimately, the

visitation issue was deferred pending another review hearing in which renewal of the

relationship between Victoria C. and her father would be revisited:

> ORDERED that Victoria C. and her father, George C., will attend family counseling with Joan McInerney in the hope of renewing their relationship. The first session will be for Victoria C. and the counselor, the second session will be for George C. and the counselor, and then the third session will be both parties together; and it is further
> ORDERED that a review hearing will be scheduled for mid-January of 2011 to see if the parties have made progress in renewing their relationship. At this hearing, the parties agree that the issue of sibling visitation can be addressed by the court if the parties do not agree on the issue. Both parties will be able to present testimony and evidence at such time on the issue of sibling visitation. . . .

Efforts at reunification between George C. and Victoria C. failed, and prior to the

scheduled review hearing, which was postponed until May of 2011, Kieran C., Lance and

---

[7] Rule 11-111(c) provides that any party may file exceptions to a master's findings, conclusions, recommendations, and proposed orders:

> c. **Review by court if exceptions filed.** Any party may file exceptions to the master's proposed findings, conclusions, recommendations or proposed orders. Exceptions shall be in writing, filed with the clerk within five days after the master's report is served upon the party, and shall specify those items to which the party excepts, and whether the hearing is to be de novo or on the record.
> Upon the filing of exceptions, a prompt hearing shall be scheduled on the exceptions. An excepting party other than the State may elect a hearing de novo or a hearing on the record. If the State is the excepting party, the hearing shall be on the record, supplemented by such additional evidence as the judge considers relevant and to which the parties raise no objection. In either case the hearing shall be limited to those matters to which exceptions have been taken.

6

Evan's mother, moved to intervene as a party, asserting that "[a]s the mother of the children with whom the court is considering visitation, she has a right to act as a party in these proceedings and participate in the case to the extent that her children are now involved," which the Circuit Court sitting as a Juvenile Court granted. The assigned master, thereafter, heard testimony regarding the effect on Victoria C. of not having visitation with her half-siblings, as well as the estrangement between Victoria C. and George and Kieran C. After Victoria C.'s counsel presented her case, George and Kieran C. moved for judgment, arguing that pursuant to this Court's decision in *Koshko,* Victoria C. had not met her burden "to show *prima facie* evidence of either parental unfitness or exceptional circumstances demonstrating the current or future detriment to the child absent visitation from that third party." The master denied the motion, relying on the Court of Special Appeals's decision in *In re Tamara R.*, 136 Md. App. 236, 764 A.2d 844 (2000)[8]:

> In review of, obviously review of Koshko and the particular reference to Tamara R., refers strictly to the portion where the court in Tamara R., at

---

[8] In *In re Tamara R.*, 136 Md. App. 236, 764 A.2d 844 (2000), decided before *Koshko v. Haining*, 398 Md. 404, 921 A.2d 171 (2007), the Court of Special Appeals considered whether Tamara R., a fourteen-year old CINA, could visit with her half-siblings over their parents' objection. The court concluded that:

> The State's interest in the protection of a minor child who has been removed from her parent's care is sufficiently compelling to justify over-riding her parent's opposition to visitation with her sibling, if there is evidence that denial of sibling visitation would harm the minor child who is separated from her family; it is not necessary that denial of visitation would also harm the siblings whom the separated child seeks to visit."

*In re Tamara R.*, 136 Md. App. at 254, 764 A.2d at 884.

page 252 indicates that the best way to determine the best interest of a child with regard to a parent's decision to decline visitation over whom the parent has custody, and to place the burden on the non-parent seeking visitation to rebut that presumption.

However, Tamara continued with a rather lengthy review of not only Troxel but also other states at page 254 through 255 regarding the significant and specific relationship between siblings and a sibling who is, again, out of the home and seeking visitation, and for a determination by the court as to harm to the child who is out of the home at this point with respect to not having visitation with the natural half-siblings.

And at this time, based upon the Court looking at this matter in the light most favorable, at this time, to Victoria's motion, and looking at Respondent's Exhibit No. 2, the Court at this time will deny the motion for judgment based on that specific reference in Tamara R.

George and Kieran C., thereafter, testified about the potential adverse effects on Lance and Evan that could result from visitation with Victoria C. George C. related that he believed it would be "emotionally damaging to the boys" to introduce Victoria C. into their lives, as a result of the "strong negative feelings" Victoria C. harbored toward him; rather, he believed that he should at least have "a neutral relationship with my daughter before she can have a relationship with the two young boys." Kieran C., likewise, testified that she did not "feel comfortable introducing my two young children to someone I don't already have at least a neutral relationship with" and that she was concerned with "the hostility my stepdaughter displays to my husband. I am concerned about how she might, unintentionally, but might influence the relationship between my sons and my husband and my sons and myself."

After concluding the hearing, the master ultimately made the following findings with respect to the visitation issue:

Your Master finds that the Respondent has, since the death of her mother in

8

2003, had many changes in her life, specifically beginning with her father's remarriage in 2005. For some time she resided with her father, stepmother, older brother, William and younger brothers, Lance and Evan, when she admittedly had a close relationship with her younger brothers. However, in March 2009 she was sent (by her father) to live with a maternal aunt, Carrie . . . , while an investigation was ongoing here in Carroll County that resulted in an "Indicated" finding as to her father. During the time that the Respondent resided in Texas, no effort was made by her father or stepmother to maintain contact with her siblings. The Respondent testified that she did not specifically ask to speak to her brothers. When her aunt returned her to Maryland in March 2010, Victoria was not permitted to return home by her father or stepmother and therefore was then placed in foster care. She was adjudicated a Child In Need of Assistance in April, 2010. Since that time she has summarily been denied a relationship with her siblings, including that there are no current pictures of her on display in the home and that Mr. [C.] indicated he would move away from the area in order to avoid visitation between the Respondent and her siblings; that she has been told it is her fault that she is not living in the family home; that Lance has asked about her on occasion, but he has been told that she is "living someplace else (whether Texas or Maryland) at this time"; that within the past year her "bedroom" is now being used for another purpose; that her stepmother believes that she will "unintentionally" influence the boys relationship with their father because of the hostility she displays toward her father.

The master recommended supervised visitation, concluding that exceptional circumstances existed in that Victoria C. would suffer a "'significant deleterious effect,'" without discussing any effect of a lack of visitation on her siblings:[9]

There is no question that Victoria has and will continue to suffer a "significant deleterious effect" *Aumiller v. Aumiller*, 183 Md. App. 71, 84-85 (2008) if not permitted some type of visitation with her siblings. It is difficult to compare the sibling relationship equally with that of grandparents to these two young

---

[9] The master also recommended that Victoria C.'s permanency plan be changed from reunification to "another permanent planned living arrangement," because "the respondent is approaching her 18th birthday and the interaction with the parent has been strained to date, thereby making reunification unlikely."

boys, wherein, other courts have placed a greater priority on sibling visitation/contact citing the special bond between siblings that could cause irreparable harm if some minimal contact is not maintained. We look to *In Re Tamara R.,* 136 Md. App. 236, 254-257 and 259 for a further discussion of this principle. See also Respondent's Exhibit 2[10] and *Fairbanks v. McCarter*, 330 Md. 39 (1993). Given the noted "unresolved trauma of both father and daughter" and the detrimental effect the lack of visitation with all of her siblings is having on the Respondent, Your Master finds that it is in her best interest to have supervised visitation with her younger step-brothers in an appropriate therapeutic setting. As the Respondent believed it appropriate for her father and step-mother to supervise said visitation the Carroll County Department of Social Services shall be responsible for assisting the Respondent, her father and step-mother with establishing said visitation in a therapeutic environment.

George C. and his wife filed joint exceptions to the master's recommendation, taking exception to two factual findings,[11] and challenging the master's decision to deny their motion for judgment, as well as the master's ultimate conclusion recommending visitation in light of *Koshko*:

4.      The Master erred in not granting the Motion for Judgment at the conclusion of the Respondent's case. The case law concerning visitation requests by third parties makes clear that there is a presumption in favor of parental decision-making that can only be overcome by a showing of parental unfitness or exceptional circumstances. Koshko v. Haining, 398 Md. 404 (2007). The Respondent's case did not present a prime facie showing of parental unfitness or exceptional circumstances to survive the Motion for

_____

[10] Exhibit 2 was a letter written from Victoria C.'s therapist, opining that visitation with Victoria C.'s half-siblings would be beneficial to Victoria.

[11] Specifically, George and Kieran C. argued that the master's finding that Victoria C. had no contact with her siblings was an incomplete finding of fact because the finding failed to note that Victoria C. had made no effort to contact her siblings while she was living in Texas. They also challenged a factual finding by the master that Victoria C. had done well in her foster care placement. Neither is in issue before us.

Judgment.

5. The Master's ultimate conclusion does not comply with the current state of the law concerning the rights of parents vis a vis requests by third parties for access to their children. Maryland courts have undertaken an analysis of the issue of third party visitation rights with the leading case being Koshko v. Haining, 398 Md. 404 (2007). The Koshko Court conducted an analysis of the history and evolution of the cases on grandparent visitation as well as other third party visitation cases such as sibling visitation in a case like this one in In Re Tamara R., 136 Md. App. 236 (2000). The Koshko Court set the standard for third party visitation cases.

6. The Koshko Court noted, "Fit parents who are presumed to act in their children's best interests, nonetheless may be hailed into court to defend their decisions absent any showing that they are unfit and without any requirement that the grandparents challenging the parental decision plead any exceptional circumstances that may tend to override the parental presumption. A proceeding that may result in a court mandating that a parent's children spend time with a third party, outside of the parent's supervision and against the parent's wishes, no matter how temporary or modifiable, necessitates stronger protections of the parental right." Koshko v. Haining, 398 Md. 404, 439 (2007).

   To address this need, the Koshko Court added a requirement of a threshold showing of either parental unfitness or exceptional circumstances indicating that the lack of visitation with the third party, in that case a grandparent, has a "significant deleterious effect" upon the children involved in the case. Id. at 441. Finally, the Court stated that the application of these principles would apply to both custody and visitation proceedings and to initial orders as well as modifications. Id. at 443-44.

7. Post-Koshko, for third party custody or visitation actions, the analysis is the same - parents are presumed to act in the best interest of their children and the court cannot apply the best interest of the child standard until a threshold showing of parental unfitness or exceptional circumstances has been made. Koshko v. Haining, 398 Md. 404, 423, 441 (2007).

8. There was no showing of parental unfitness. The Master relies on a finding of exceptional circumstances. This concept has been addressed in Aumiller v. Aumiller, 183 Md. App. 71 (2008) and Brandenburg v. LaBarre, 193 Md. App. 178 (2010). In both of these cases, the court dealt with requests for visitation over the objection of fit parents. In

11

Aumiller, the court noted that exceptional circumstances would be defined on a case by case basis but that a refusal to allow visitation in and of itself would not support a finding of harm to the children to allow a finding of exceptional circumstances. Aumiller v. Aumiller, 183 Md. App. 71, 83-84 (2008).

9. The Brandenburg Court noted that solid evidence and not speculation must be presented to support the harm by a lack of visitation and that type of evidence necessary to meet this burden might be expert testimony. Brandenburg v. LaBarre, 193 Md. App. 178, 190-91 (2010). Expert testimony was presented in this matter and that testimony supported the decision of the parents that sibling visitation was not appropriate.

10. The Master's decision speaks only to the best interests of the Respondent. The Master made no consideration of the best interests of Lance and Evan [C.]. The Court must also consider the best interests of these children and whether putting these young children in the middle of the hostility between their sister and father serves their best interests. It is clear that, for these children, who were very young when the Respondent left and have no present relationship with her, . . . placed in the midst of the battle between warring parties will have no benefit as Joan McInerney testified, a likely detriment.

11. The law mandates that the parents decide how and when any sibling visitation should occur. Because visitation infringes on their fundamental liberty interest as parents, nothing less will satisfy the constitutional protections given to their role.

Victoria responded that, "[t]he presumption in favor of parental decision-making claimed by the Parents did not apply in this case, and Victoria's constitutional right of establishing and maintaining a relationship with her siblings was rightly affirmed." She also argued pursuant to the Court of Special Appeals's decision in *In re Tamara R.*, that her well-being was a relevant consideration. She asserted, moreover, that *Koshko* was inapplicable because sibling visitation cases should be analyzed under a different standard than grandparent visitation cases, and unlike in *Koshko*, she was seeking supervised visitation.

12

Finally, she alleged that a *prima facie* showing of exceptional circumstances had been made, because exceptional circumstances are "defined on a case by case basis, which is exactly what the Master has done in arriving at her decision."

Prior to the resolution of the exceptions, Victoria turned eighteen and informed the Department of Social Services that she would be leaving her foster placement to live with a friend. The Circuit Court sitting as a Juvenile Court, thereafter, ordered that her supervision by the Department be terminated. The court then held an exceptions hearing on the issue of visitation in which no further evidence was adduced. After hearing argument, the judge issued an opinion, denying the exceptions and ordering supervised visitation.

In reaching his conclusion, the Circuit Court Judge also reviewed the Court of Special Appeals's decision in *Tamara R.*, 136 Md. App. 236, 764 A.2d 844, in which the intermediate appellate court determined that the juvenile court had jurisdiction to order that a child in a foster care placement have visitation with her half-siblings, contrary to the parent's wishes, as long as there is a showing of harm to the child in foster care, because of the State's interest in protecting that child. Because, "Victoria C. has since left the DSS system and, except for the history with the juvenile court system, she is otherwise a fully functioning adult," the judge did not apply the statutory framework for a Child in Need of Assistance, and opined that there was no statutory basis for visitation; instead he derived a "constitutionally sound common law preference accorded to siblings in family matters," and a "broader rule" that "a sibling seeking visitation of another sibling that is still in the care,

13

custody and control of a fit parent, states a *prima facie* case for visitation when that sibling

is harmed by the denial of visitation," which Victoria had proven:

> Under the rule of *In re Tamara R.*, the Respondent presented a *prima facie* argument that she was entitled to visitation with her siblings because she offered evidence that there was a harm to herself resulting from the denial of visitation to her minor siblings. Thus, she met her burden as required by Maryland's common law presumption in favor of siblings seeking visitation of their siblings in contested settings. Thus, the Master appropriately denied the motion for judgment.

The judge reasoned, however, that the presumption in favor of visitation was rebutted

by the evidence presented by George and Kieran C. that visitation would harm Victoria's

siblings, Lance and Evan, concluding, then, that "Victoria C. is left without a presumption

in favor of her, and thus must meet the more rigorous test . . . in *Koshko*." According to the

judge, however, exceptional circumstances existed, based upon Kieran C.'s testimony that

Lance remembered Victoria C., from which the judge inferred Lance desired visitation, its

absence from which the judge inferred that Lance was harmed; that Victoria C. sought

visitation shortly after returning to Maryland from Texas; that the benefits of visitation to

Victoria C. would be great and the disruption to the lives of Lance and Evan would be

minimal; that Victoria C. had a genuine desire to visit with her siblings; and that Victoria C.

was in the situation as a result of George C.'s actions:

> Under *Brandenburg* and *Aumiller*, Evan's lack of memory of Victoria can only be counted as a lack of visitation of her, and thus cannot amount to a harm that would "lead to an inference of substantial deleterious effects." The testimony of both parents, however, is that Lance does remember Victoria. The Court infers that Lance would like to have contact with Victoria, and this raises an inference that there is a significant deleterious effect on Lance by

14

virtue of denying him visitation with his older sister. This probably is enough to meet the exceptional circumstances standard under *Brandenburg* in order to overcome the burden with respect to Lance, however, the Court will also look to the traditional factors in determining exceptional circumstances, as developed in *Ross v. Hoffman*.

Derived from custody cases, the factors used to determine the existence of exceptional circumstances are: 1) the length of time the child has been away from the biological parent; 2) the age of the child when care was assumed by the third party; 3) the possible emotional effect on the child of a change of custody; 4) the period of time which elapsed before the parent sought to reclaim the child; 5) the nature and strength of the ties between the child and the third party custodian; 6) the intensity and genuineness of the parent's desire to have the child; and 7) the stability and certainty as to the child's future in the custody of the parent. *Ross v. Hoffman*, 280 Md. 172, 191 (1977) (cited in *Brandenberg v. LaBarre*, 193 Md. App. 178, 190 (2010), n. 15).

As the *Brandenburg* court and courts before it noted, these factors are not entirely applicable to visitation cases. However, here, at the time of the visitation hearing, Victoria had been away from the children approximately two years. Lance was approximately 3 years old, and Evan, 18 months when Victoria left the family home. There is a concern over the possible emotional effect on the children, as testified by both George and Kieran C. The first appearance of Victoria's request to visit her siblings appeared September 14, 2010, about four-and-a-half months after she was adjudged CINA (which occurred April 26, 2010). There is no evidence that the relationship between Lance, Evan, George and Kieran is anything but healthy. The uncontroverted testimony is that, prior to Victoria's leaving the family home, her relationship with Lance was strong; it was less so with Evan, but nevertheless close. The genuineness of Victoria's desire to visit her siblings appears true, and is uncontroverted. The intensity appears strong. *See e.g.*, Hrg. Tr. at 16 (Q: "Since you have been out of the home, can you tell us what the impact of not seeing them has been on you?" A: "It has been like a hole, kind of. I just–I miss them. They were an entire section of my life.") Although Joan McInerney, a private therapist, testified that Victoria's feelings toward sibling visitation were "[n]ot strong," the Court discounts this testimony because the purposes of those therapy sessions was aimed at reconciling the relationship between Victoria and George C., which that witness testified she believed was paramount to continuing her therapy.

While there is concern over the possible emotional effect on the children, the applicable traditional factors in determining exceptional circumstances in balance appear to show exceptional circumstances. While

15

Victoria was in Texas, visitation would have been impractical if not impossible. She sought visitation within five months of being adjudged CINA, showing a desire to reestablish a relationship with her siblings. The disruption to the children's lives seem to be minimal and the benefits to Victoria are great. While the parent-child relationship appears healthy between the two minors and the two parents, that relationship is likely to remain healthy also, despite visitation.

Furthermore, it cannot be ignored that the reason Victoria C. is before the Court and the reason she does not have contact with her siblings to begin with is because she left the family home following a DSS investigation that found an indication of abuse against her father. The plan developed resulted in Victoria's removal from the family home to her maternal aunt's home in Texas. When circumstances changed, she returned to her home state of Maryland to be placed in a hotel because she was not accepted back into the family home, which resulted in her being taken into the limited guardianship of the State through the Carroll County Department of Social Services. This would also appear to be an exceptional circumstance determined on a "case-by-case" basis, as allowed by *Aumiller*.

Because the Court can infer harmful effects on at least Lance that result in significant deleterious effects of losing the relationship with his sister, because the balance of applicable traditional factors show exceptional circumstances, and because the situation bringing Victoria C. before this Court appears in itself to be an exceptional circumstance, the Court finds that Victoria has met her burden in overcoming the presumption afforded parents in the upbringing of their children under the U.S. Constitution.

The judge then analyzed whether it was in Lance's and Evan's best interests to experience visitation with Victoria C. and concluded it was:

[T]he "sibling relationship has been widely recognized as an important one, which will be given significant consideration and protection by courts in cases involving the family." *In re Tamara R.*, *supra*. Lance clearly has asked about Victoria, whom he last saw when he was 3. Victoria had a loving relationship with Lance and Evan before she left the family home. This tends to show that it would be in Lance's emotional best interest to see Victoria again. This side of the equation is strengthened by the significance placed upon the sibling relationship. With respect to Evan, there being a loving relationship with Victoria versus not having one favors visitation. While this would ordinarily

16

be balanced by the concerns of the parents, the fact that they are siblings tips the scales in favor of a finding that it is in Evan's best interests to have visitation with Victoria.

George and Kieran C. filed a timely notice of appeal, and in a reported opinion, the Court of Special Appeals reversed, *In re Victoria C.*, 208 Md. App. 87, 56 A.3d 338 (2012), initially determining that the standard established in *Koshko* was applicable to the matter *sub judice,* opining:

> We see no reason why the *Koshko* test does not apply in the instant case. George and Kieran clearly possess a fundamental liberty interest in the care, custody, and control of Lance and Evan. As a result, Victoria's petition for visitation must be considered within a framework that safeguards George and Kieran's constitutional right.

*Id.* at 98, 56 A.3d at 344. Our intermediate appellate court rejected *Tamara R.*'s common law presumption and questioned the viability of *Tamara R.* in light of our decision in *Koshko*. Even assuming *Tamara R.* survived, however, the Court of Special Appeals determined its tenets were inapplicable in the instant case:

> We first note that *In re: Tamara R.* was decided seven years before the Court of Appeals decision in *Koshko*. *In re: Tamara R.*, therefore, has limited utility to an analysis of third-party visitation post-*Koshko*. Still, assuming *arguendo* that the holding of *In re: Tamara R.* is still good law, it is distinguishable from the instant case.
>
> * * *
>
> In this case, unlike *In re: Tamara R.*, the sibling seeking visitation is an adult. Therefore, *In re: Tamara R.*, in which the Court balanced the parent's constitutional interest against the State's interest in the protection of a minor child, is of limited relevance. Here, there is no State interest implicated. Although *In re: Tamara R.* emphasized the importance of sibling relationships, we do not read *In re: Tamara R.* to stand for the proposition that, unlike the standard applied for all other third parties seeking visitation, a different

17

standard should apply for adult siblings seeking visitation. We acknowledge that "Maryland courts ... have frequently expressed the view that ordinarily, the best interests and welfare of the children of the same parents are best served by keeping them together to grow up as brothers and sisters under the same roof." *Id*. at 256, 764 A.2d 844. We further recognize that "the sibling relationship has long been recognized as an important one, which will be given significant consideration and protection by courts involving the family." *Id*. at 259, 764 A.2d 844. This relationship, however, has generally been discussed in the context of a sibling relationship between minor children, and in the instant case, the sibling seeking visitation is an adult.

 *Id.* at 98-99, 56 A.3d at 344-45 (footnote omitted).  After reasoning "that adult siblings, like all third parties seeking visitation, are subject to the requirements of *Koshko*," *id.* at 101, 56 A.3d at 345, the Court of Special Appeals concluded that exceptional circumstances did not exist to warrant overcoming the presumption that George and Kieran C.'s decision withholding permission from Victoria C. to visit with Lance and Evan was in their best interests.  The pivotal inquiry for exceptional circumstances, the Court of Special Appeals reasoned, was not addressed, that being whether Lance and Evan would be harmed by their inability to visit with Victoria C., not whether Victoria C. was harmed:

> Rather than focusing on whether the minor children were harmed by not having visitation with Victoria, both the Master and the circuit court considered the detriment suffered by Victoria from the absence of visitation with her siblings.  While it may be true that Victoria has suffered unfortunate and regrettable harm, harm suffered by an adult as the result of a denial of visitation with minor children is not a consideration in a court's exceptional circumstances analysis. *See Brandenburg, supra,* 193 Md.App. 178, 996 A.2d 939 (not considering harm to grandparents resulting from the denial of visitation); *Aumiller, supra,* 183 Md.App. 71, 959 A.2d 849 (focusing on whether harm to minor children was caused by denial of visitation rather than harm to grandparents). Instead, the focus must be on whether a minor child is harmed by the absence of visitation.

18

*Id.* at 105-06, 56 A.3d at 348. Accordingly, the Court of Special Appeals reversed the decision of the Circuit Court sitting as a Juvenile Court and remanded for an entry of an order denying Victoria's request for visitation.

There are two major issues presented herein, the first of which is whether the Circuit Court had jurisdiction to order sibling visitation. The Circuit Court Judge expressly stated that there was no statutory basis to authorize such visitation, opining that "there is no statute in Maryland similar to the Maryland grandparent visitation statute providing for sibling visitation," referenced in *Koshko* for jurisdictional authority; the judge, nevertheless proceeded to order supervised visitation between Victoria C. and her siblings based upon common law and constitutional jurisdictional authority derived from *Tamara R.* In order to reach the merits of the matter before us, we assume without deciding, however, that jurisdiction exists, although on remand, whether there is a jurisdictional basis to order sibling visitation must be explored.[12] The merits involve whether *Koshko* applies, so that

_____

[12] George C. did not question the authority of the Circuit Court sitting as a Juvenile Court to order visitation between Victoria C. and her half-siblings. Although it is true that the lack of jurisdiction can be raised *sua sponte* by this Court, Rule 8-131(a), *County Council v. Offen*, 334 Md. 499, 508, 639 A.2d 1070, 1074 (1994), we do not want to do so without giving the parties an opportunity to explore, brief, and present arguments regarding whether a statutory basis for jurisdiction exists on remand.

The quandary exists because of the necessity of having a statutory basis to order visitation, such as we explored in *Koshko* for the Grandparent Visitation Statute, Section 9-102 of the Family Law Article, Md. Code (1999, 2012 Repl. Vol.). The Circuit Court Judge opined that there was no statutory basis to order sibling visitation; Victoria C., however, has

(continued...)

19

exceptional circumstances relative to Lance and Evan must be proven in this case before

<hr/>

(...continued)
directed us, as well as others, to consider the rubric of Section 5–525.2 of the Family Law Article, which provides:

> **Out-of-home placement and foster care – Sibling placement and visitation rights.**
> (a) *Placement of siblings.* – (1) A local department shall place together siblings who are in an out-of-home placement under § 5-525 of this subtitle if:
> (i) it is in the best interests of the siblings to be placed together; and
> (ii) placement of the siblings together does not conflict with a specific health or safety regulation.
> (2) If placement of the siblings together conflicts with a specific health or safety regulation, the local department may place the siblings together if the local department makes a written finding describing how placement of the siblings together serves the best interests of the siblings.
> (b) *Visitation rights.* – (1) Any siblings who are separated due to a foster care or adoptive placement may petition a court, including a juvenile court with jurisdiction over one or more of the siblings, for reasonable sibling visitation rights.
> (2) If a petitioner under this subsection petitions a court to issue a visitation decree or to amend an order, the court:
> (i) may hold a hearing to determine whether visitation is in the best interest of the children;
> (ii) shall weigh the relative interests of each child and base its decision on the best interests of the children promoting the greatest welfare and least harm to the children; and
> (iii) may issue an appropriate order or decree.

Section 5-525.2 does not apply in the matter *sub judice*. Section 5-525 is part of a larger statutory scheme entitled "Child Welfare Services; Foster Care." Section 5-525.2(b), authorizing the juvenile court to order sibling visitation, refers to siblings who are identified in Section 5-525.2(a) as those who are in an "out-of-home placement." Read in its proper context, therefore, Section 5-525.2(b) is applicable only to visitation among siblings who are in an out-of-home placement, which does not include Lance and Evan.

The parties will have the opportunity, on remand, to brief and argue whether there are any other statutory bases for sibling visitation.

visitation by a CINA sibling can be ordered.[13]

Parents have a fundamental right to direct and control the upbringing of their children. *In re Samone H.*, 385 Md. 282, 300, 869 A.2d 370, 380 (2005). The ability to deny visitation by third parties to the minor children, absent exceptional circumstances, *Koshko v. Haining*, 398 Md. 404, 430, 921 A.2d 171, 186 (2007), is an undeniable part of that right. Victoria C. asserts, however, that her status as a Child in Need of Assistance, as well as her status as a sibling, renders her without, rather than within, a "third-party"designation, and therefore, *Koshko* is inapposite to the instant matter. Our jurisprudence makes clear that third parties are those who are not parents.

Our most significant recent opinion in which this Court defined who is a "third party" is *McDermott v. Dougherty*, 385 Md. 320, 418, 869 A.2d 751, 808 (2005). In *McDermott*, we were presented with a custody dispute between the child's father, Mr. McDermott, and the maternal grandparents, to whom he had entrusted the care of his son until he could return from sea from a tour of duty as a merchant seaman. We ultimately concluded that the grandparents were required to show parental unfitness or exceptional circumstances in order

---

[13] Victoria C. asserts, initially, that George C. has waived his argument that the Circuit Court's ruling ordering visitation violated his parental rights because, when the dispute regarding sibling visitation initially arose at a review hearing, the parties agreed to defer resolution of the issue pending family therapy; in Victoria C.'s view, "[h]aving accepted the authority of the Juvenile Court to decide the sibling visitation," George C. "should not be heard to complain now that its exercise of that authority unconstitutionally interfered with his parental rights." We find no merit in this argument.

21

to retain custody, before a trial court could engage in a best interests analysis.[14] We reasoned that, "the non-constitutional best interests of the child standard, absent extraordinary (*i.e.,* exceptional) circumstances, does not override a parent's fundamental constitutional right to raise his or her child when the case is between a fit parent, to whom the fundamental parental right is inherent, and *a third party who does not possess such constitutionally-protected parental rights.*" *Id.* at 418, 869 A.2d at 808 (emphasis added). A person not a parent, then, is a third party.

Since *McDermott,* we have held in *Koshko* that grandparents are third parties, but most significantly, we declared that a *de facto* parent was a third party in *Janice M. v. Margaret K.*, 404 Md. 661, 948 A.2d 73 (2008). In *Janice M.*, Margaret K., who had been the same sex partner of Janice M., sought custody and visitation with Janice M.'s adopted daughter, Maya, with whom Janice and Margaret had lived with for five years while performing parenting functions, having "divided the responsibilities for preparing Maya's food, changing her diapers, bathing her, handling her schooling, addressing her healthcare needs, and performing most other caretaking duties." *Id.* at 666, 948 A.2d at 76. After the parties' separation, Margaret K. became dissatisfied with the amount of visitation Janice M.

---

[14] The trial court in *McDermott v. Dougherty*, 385 Md. 320, 422, 869 A.2d 751, 811 (2005), had determined that exceptional circumstances existed because of Mr. McDermott's extended time at sea. We disagreed and opined that involuntary time away from a child as a result of employment could not constitute exceptional circumstances.

permitted with Maya; she filed a complaint in the Circuit Court for Baltimore County seeking custody, or alternatively, visitation. The Circuit Court Judge denied custody. He concluded that Margaret K. was a "de facto" parent because Janice M. had consented to and fostered the parental relationship between Margaret K. and Maya, Margaret K. had lived with Maya, she performed parenting functions for Maya, and a parent-child bond had been forged, enabling him to apply a "best interests" standard and order visitation.

The Court of Special Appeals affirmed, and we granted *certiorari*, to consider the issue of "whether, when the party asserting visitation rights meets the requirements for de facto parent status, a court, without first finding exceptional circumstances or parental unfitness, may apply the best interests of the child standard." *Id.* at 680, 948 A.2d at 84.

We declined to "recognize *de facto* parent status . . . as a legal status in Maryland," reasoning that, to do so, would "short-circuit[]" the requirement that a third party show parental unfitness or exceptional circumstances, as articulated by *McDermott* and *Koshko*. *Id.* at 685, 948 A.2d at 87. We opined, rather, that "[e]ven were we to recognize some form of de facto parenthood, the real question in the case . . . will remain, whether, in a custody or visitation dispute, a third party, non-biological, non-adoptive parent, who satisfies the test necessary to show de facto parenthood should be treated differently from other third parties," and concluded that "where visitation or custody is sought over the objection of the parent, before the best interest of the child test comes into play, the *de facto* parent must establish that the legal parent is either unfit or that exceptional circumstances exist." *Id.* at 685, 948

23

A.2d at 87. This is because:

> A fair reading of *McDermott* and *Koshko* leads to no other conclusion. We reiterate what we said in *McDermott*:
>
>> "In the balancing of court-created or statutorily-created 'standards,' such as 'the best interest of the child' test, with fundamental constitutional rights, in private custody [and visitation] actions involving private third-parties where the parents are fit, absent extraordinary (i.e., exceptional) circumstances, the constitutional right is the ultimate determinative factor; and only if the parents are unfit or extraordinary circumstances exist is the 'best interest of the child' test to be considered...."

*Id.* at 685-86, 948 A.2d at 87 (alterations in original), quoting *McDermott*, 385 Md. at 418-19, 869 A.2d at 808-09. A person, thus, seeking visitation, who is not a biological or adoptive parent is a third party. A sibling, whether full, half or CINA, remains a third party. Accordingly, we overrule the portions of *Tamara R.* that are inconsistent with this holding.

We note, finally, with respect to this issue, that Victoria C.'s relationship with Kieran C. provides further support for our conclusion that Victoria C. is a third party. Kieran is not a biological parent of Victoria C. There is nothing in the record to suggest that Kieran adopted Victoria C. Thus, Kieran's views as to with whom her two biological children may associate is entitled to the same respect as the parents in *Koshko*. Victoria C. lived with her father and Kieran for only approximately four years. Although the DNA of George contributes to who Victoria C. is today, Victoria C. shares no other legal relationship with the marital unit of George and Kieran. Victoria C., therefore, as to her half-brothers, stands

24

in very much the same relationship as the grandparents (whether maternal or paternal) did to the minors at the heart of *Koshko*.

Having concluded that Victoria C. is a third party, we turn now to the application of *Koshko*. In *Koshko,* we considered the validity of the Grandparent Visitation Statute, Section 9-102 of the Family Law Article, Maryland Code (1984, 2004 Repl. Vol.),[15] after a trial court ordered visitation over the objection of the children's parents, the Hainings. The Hainings appealed and argued, *inter alia*, that as applied to them, the Grandparent Visitation Statute impermissibly interfered with their parental rights because the trial court engaged in a "best interests of the child" analysis without a threshold showing of either parental unfitness or exceptional circumstances.[16] We agreed and concluded that before a court may order third-

---

[15] The Grandparent Visitation Statute provided:

> An equity court may:
> (1) consider a petition for reasonable visitation of a grandchild by a grandparent; and
> (2) if the court finds it to be in the best interests of the child, grant visitation rights to the grandparent.

Md. Code (1984, 2004 Repl. Vol.), § 9-102 of the Family Law Article. The Grandparent Visitation Statute continues to reside, unamended, at Section 9-102 of the Family Law Article, Md. Code (1999, 2012 Repl. Vol.).

[16] The Hainings also challenged the facial constitutional validity of the Grandparent Visitation Statute in light of the Supreme Court's decision in *Troxel,* because the statute afforded no presumption in favor of parental decision-making. We declined to declare the statute unconstitutional, instead reading into the statute a presumption that parental decisions regarding their children are valid, applying the "'canon of constitutional avoidance',which
(continued...)

25

party visitation, third parties must make a *prima facie* showing of parental unfitness or exceptional circumstances that the lack of visitation "has a significant deleterious effect *upon the children who are the subject of the petition*." *Koshko*, 398 Md. at 441, 921 A.2d at 193 (footnote omitted) (emphasis added).

In the instant case, both the master and the trial judge ultimately found that there were exceptional circumstances, but both erred by relying on perceived harm to Victoria C., not to Lance and Evan. The master concluded that, "*Victoria* has and will continue to suffer a 'significant deleterious effect.'" (emphasis added). The Circuit Court Judge, likewise, focused primarily on the harm to Victoria C., while relying only on building blocks of inferential adverse effects on Lance and Evan; the only finding of harm to Lance or Evan that the Circuit Court Judge made was that Lance remembered Victoria C., leading the judge to infer that Lance wanted to visit with her, thereafter, inferring a substantial deleterious effect on Lance as a result of a lack of visitation. There was no evidence on this record which demonstrated that Lance or Evan were harmed from a lack of visitation with Victoria C. Evidence adduced was only to the contrary.

The judgment of the Court of Special Appeals reversed the order granting visitation

_____

(...continued)

provides that 'a statute will be construed so as to avoid a conflict with the Constitution whenever that course is reasonably possible.'" *Koshko v. Haining*, 398 Md. 404, 425-26, 921 A.2d 171, 183 (2007) (footnote omitted), quoting *In re James D.,* 295 Md. 314, 327, 455 A.2d 966, 972 (1983).

in favor of Victoria C. and remanded the case to the Circuit Court sitting as a Juvenile Court to enter an order denying the request for visitation, *In re Victoria C.*, 208 Md. App. at 107, 56 A.3d at 349; we agree that the order should be reversed, but because the master and the Circuit Court Judge relied on *Tamara R.*, rather than on the applicable *Koshko* standard, we will remand for a consideration of whether jurisdiction actually exists to order sibling visitation and, if so, whether a deleterious effect on Lance and Evan can be proven.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND VACATED IN PART; CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH INSTRUCTIONS TO VACATE THE JUDGMENT OF THE CIRCUIT COURT FOR CARROLL COUNTY AND TO REMAND TO THAT COURT FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION. COSTS TO BE PAID BY PETITIONER.**

Circuit Court for Carroll County
Case No: 06-I-10-005291
Argued: October 3, 2013

IN THE COURT OF APPEALS

OF MARYLAND

No. 15

September Term, 2013

---

IN RE: VICTORIA C.

---

Barbera C.J.,
Harrell
Battaglia
Greene
Adkins
McDonald
Rodowsky, Lawrence F., (Retired,
        Specially Assigned),

JJ.

---

Dissenting Opinion by Adkins, J., which
Greene, J. joins.

---

Filed: March 27, 2014

Respectfully, I dissent. The Majority overstates the certainty of our jurisprudence on sibling visitation. In so doing, it unwisely pilots the law on parental rights beyond the holdings of our prior cases, as well as the Supreme Court decisions on which they were founded. At the same time, it denies children who are removed from the family without fault of their own the right to maintain a relationship with their siblings. Further, the Majority, adopting the mantle of a fact-finder, substitutes its own factual conclusions for those of the trial court.

### *The Majority's Legal Analysis*

The Majority derives its certainty regarding our jurisprudence from three cases in which sibling visitation was not even considered. The Majority relies on our holdings in *Koshko v. Haining*, 398 Md. 404, 921 A.2d 171 (2007), *McDermott v. Dougherty,* 385 Md. 320, 869 A.2d 751 (2005), and *Janice M. v. Margaret K.,* 404 Md. 661, 948 A.2d 73 (2008). In Koshko we held that grandparents are third parties. *See Koshko*, 398 Md. at 444–45, 921 A.2d at 195. In *McDermott* we held that grandparents entrusted with the temporary care of a child are third parties. *See McDermott*, 385 Md. at 417–18, 869 A.2d at 808. In *Janice M.* we held that a former live-in life partner that shared parenting duties was a third party. *See Janice M.*, 404 Md. at 685, 948 A.2d at 87. Nonchalantly reducing a child of the family to the status of a third party, the Majority holds that "[o]ur jurisprudence makes clear that third parties are those who are not parents." (Maj. Slip Op. at 20–21).

Under any fair reading of these cases, taken together, they merely specify that three categories of non-parent adults are third parties. They do not establish that the terms "third

party" and "non-parent" are co-extensive and interchangeable. It is inconceivable to me that siblings—half, full or CINA—can be third parties *vis-á-vis* their parents and each other. Although the benefits offered by grandparents to children should not be underestimated, the grandparent–grandchild relationship is lesser and different in character from the unique bond and life-long relationship a person shares with her siblings. Siblings are not third parties to the nuclear family. Rather, they are core members of the family, as close by birth as two humans can be, excepting identical twins.

Sibling relationships are significant because they provide a built-in mutual support system and offer developmental opportunities. *See* Angela Ferraris, Comment, *Sibling Visitation as a Fundamental Right in* Herbst v. Swan, 39 New Eng. L. Rev. 715, 718 (2004–05). Importantly, the "'relationships people share with siblings are often the longest-lasting they will ever have. . . . around after parents, and even spouses and children, are gone.'" *Id*. at 717 (quoting Diane Crispell, *The Sibling Syndrome*, 18 Am. Demographics 24, 26 (Aug. 1996)). Indeed, "[a]s siblings age, they may look to each other for understanding, for acceptance, for support, or even for financial assistance. Studies show that adult sibling relationships positively affect sibling well-being." Paige Ingram Castañeda, Comment, *O Brother (Or Sister), Where Art Thou: Sibling Standing in Texas*, 55 Baylor L. Rev. 749, 774 (2003) (footnote omitted); *see also*, Ellen Marrus, *"Where Have You Been, Fran?" The Right of Siblings To Seek Court Access To Override Parental Denial of Visitation*, 66 Tenn. L. Rev. 977, 980–87 (1999) (discussing the importance of the sibling

bond).

Some jurisdictions have held the right to associate with one's sibling to be a constitutional right. *See, e.g., Rivera v. Marcus*, 696 F.2d 1016, 1026 (2d Cir. 1982) (holding that "children surely possess a liberty interest in maintaining, free from arbitrary state interference, the family environment that they have known since birth."); *Aristotle P. v. Johnson*, 721 F. Supp. 1002, 1005 (N.D. Ill. 1989) (holding that "children['s] relationships with their siblings are the sort of 'intimate human relationships' that are afforded 'a substantial measure of sanctuary from unjustified interference by the State.'" (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618, 104 S. Ct. 3244, 3250 (1984))); *L. v. G.*, 203 N.J. Super. 385, 398, 497 A.2d 215, 222 (Ch. Div. 1985) (holding that "siblings possess the natural, inherent and inalienable right to visit with each other."). I would not go that far.

Nonetheless, I reinforce the observation made in *In re Tamara R.* that:

> [T]he sibling relationship has been widely recognized as an important one, which will be given significant consideration and protection by courts in cases involving the family. Recognizing the value in sibling relationships puts in perspective the importance of the evidence that [an individual] would be harmed by the denial of sibling visitation.

136 Md. App. 236, 259, 764 A.2d 844, 856 (2000).

To be sure, parents have a fundamental right to raise their children. Yet that right is not absolute, and we should view it in the context of the family situation presented. This Court held in *Koshko* that the grandparent visitation statute, Md. Code (1984, 2004 Repl.

Vol.), § 9-102 of the Family Law Article ("GVS")[1] was constitutionally faulty because it allowed "**third parties** . . . to disturb the judgment of a parent . . . [without] evidence that the parents are either unfit or that there are exceptional circumstances warranting the relief sought[.]" 398 Md. at 440, 921 A.2d at 192 (emphasis added). A CINA child who brings a petition for visitation is forced to do so because something has gone awry within the nuclear family and a member of the nuclear family has been removed—that, in itself, distinguishes this case from the grandparent visitation petitions brought in *Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054 (2000) and *Koshko*. I submit that neither *Troxel* nor *Koshko* should be extended to sibling visitation.

### *The Majority's Reading Of The Lower Court Proceedings*

Assuming, nonetheless, that *Koshko* controls this case, the Majority incorrectly holds that Circuit Court failed to follow *Koshko*. I find particularly baffling the Majority's claim that "the Circuit Court Judge relied on *Tamara R.*, rather than on the applicable *Koshko* standard[.]" (Maj. Slip Op. at 25). As explained below, a straightforward reading of the Circuit Court demonstrates that the court applied *Koshko* in reaching its decision.

---

[1] Md. Code (1984, 2004 Repl. Vol.), § 9-102 of the Family Law Article provided that:

> An equity court may:
> (1) consider a petition for reasonable visitation of a grandchild by a grandparent; and
> (2) if the court finds it to be in the best interests of the child, grant visitation rights to the grandparent.

4

In *Koshko*, maternal grandparents, facing strenuous objection from the children's parents, petitioned the circuit court for visitation with their three grandchildren under the GVS. 398 Md. at 410, 921 A.2d at 174. Finding that the grandparents had overcome their constitutional burden and rebutted the presumption in favor of the parents' determination of the best interests of the children, the trial court granted visitation rights to the grandparents. *Id*. When the Court of Special Appeals affirmed the trial court, the parents petitioned for *certiorari*, claiming that the GVS was unconstitutional as applied. *Koshko*, 398 Md. at 412, 921 A.2d at 175.

This Court held that the GVS needed to be "supplemented by judicial interpretation with an inferred presumption that parental decisions regarding their children are valid." *Koshko*, 398 Md. at 425, 921 A.2d at 183 (footnote omitted). We did so because the statute did not acknowledge the role played by parental determinations in assessing the best interests of the child, and because without such a presumption, the statute would be invalid under *Troxel. Koshko*, 398 Md. at 426–28, 921 A.2d at 183–185. We further explained:

> [I]f third parties wish to disturb the judgment of a parent, those third parties must come before our courts possessed of at least *prima facie* evidence that the parents are either unfit or that there are exceptional circumstances warranting the relief sought before the best interests standard is engaged.

*Koshko*, 398 Md. at 440, 921 A.2d at 192. Thus, we articulated the standard that any third party pursuing visitation against the wishes of a parent first has to rebut the presumption in favor of the parent by making a showing of either parental unfitness or exceptional

5

circumstances before a court could reach the merits of the petition under the best interests of the children standard. *Id.*

In this case the Circuit Court clearly applied the *Koshko* standard, after discussing *Tamara R.* in the context of a denied motion for judgment. The trial court concluded that George and Kieran successfully rebutted the *Tamara R.* common law preference in favor of sibling visitation, rendering disposition of this case to be governed by *Koshko*:

> Under the rule of *In re Tamara R.*, the Respondent presented a *prima facie* argument that she was entitled to visitation with her siblings because she offered evidence that there was harm to herself resulting from the denial of visitation to her minor siblings. Thus, she met her burden as required by Maryland's common law presumption in favor of siblings seeking visitation of their siblings in contested settings. Thus, the Master appropriately denied the motion for judgment.
>
> Following the Master's denial of the motion for judgment, George and Kieran C. presented evidence, noted by the Master, of harm to the minor siblings, although the Master did not draw the conclusion that there was harm. In her findings, the Master noted that George had concerns "for his younger children, in terms of the level of vitriol displayed by the Respondent towards him"; that Kieran had concerns over allowing Victoria to have a relationship because of the "level of hostility displayed by the Respondent towards her father"; and that the [sic] Kieran had "concerns for placing young children in the middle of a volatile relationship."
>
> Accordingly, the Master appropriately afforded the minor children's parents the opportunity to rebut the presumption in the common law. Thus, *In re Tamara R.* would seem to instruct that, because the fit parents presented evidence of harm, they rebutted the presumption that arises in favor of siblings. Upon the conclusion of the case, Victoria C. is left without a presumption in favor of her, and **thus must meet the more**

6

**rigorous test outlined above in *Koshko*.** (Emphasis added.)

The trial court also observed that "the requirements of *Koshko* . . . must be applied here, too[,]" and "*Koshko* is the minimum bar which state limitations on parents' fundamental rights must meet, and thus it is the bar over which Victoria C. must pass."

The Circuit Court then explained the scope of its analysis, stating that "[b]ecause the children in *Koshko* who were the subject of the petition were the children whom the grandparents sought to visit, the question for this Court to answer is: Is there a significant deleterious effect on Lance and Evan?" The court then, in accordance with *Koshko*, investigated whether there were exceptional circumstances, before considering the best interests of the children standard. The court concluded that there were indeed exceptional circumstances present in this case. In detailing its finding of exceptional circumstances, the court explained:

> Because the Court can infer harmful effects on at least Lance that result in significant deleterious effects of losing the relationship with his sister, because the balance of applicable traditional factors show exceptional circumstances, and because the situation bringing Victoria C. before this Court appears in itself to be an exceptional circumstance, the Court finds that Victoria has met her burden in overcoming the presumption afforded parents in the upbringing of their children under the U.S. Constitution.

The court then concluded that it would be in Lance and Evan's best interests to have visitation with Victoria:

> Lance clearly has asked about Victoria, whom he last saw when he was 3. Victoria had a loving relationship with Lance and

7

Evan before she left the family home. This tends to show that it would be in Lance's emotional best interests [sic] to see Victoria again. This side of the equation is strengthened by the significance placed upon the sibling relationship. With respect to Evan, there being a loving relationship with Victoria versus not having one favors visitation. While this would ordinarily be balanced by the concerns of the parents, the fact that they are siblings tips the scales in favor of a finding that it is in Evan's best interests to have visitation with Victoria.

These passages from the Circuit Court's opinion demonstrate that, contrary to the Majority's holding, it understood and applied the applicable *Koshko* standard. (Maj. Slip Op. at 25).

The Majority also criticizes the Circuit Court as:

[F]ocus[ing] primarily on the harm to Victoria, while relying only on building blocks of inferential adverse effects on Lance and Evan; the only finding of harm to Lance or Evan that the Circuit Court Judge made was that Lance remembered Victoria, leading the judge to infer that Lance wanted to visit with her, thereafter, inferring a substantial deleterious effect on Lance as a result of a lack of visitation. There was no evidence on this record which demonstrated that Lance or Evan were harmed from a lack of visitation with Victoria C. Evidence adduced was only to the contrary.

(Maj. Slip Op. at 25).

I disagree. The Circuit Court articulated and followed the very legal standard the Majority sanctions. To hold that the court did not apply *Koshko* or did not consider whether there were exceptional circumstances that applied to Lance and Evan is to ignore the Circuit Court's words and actions.[2]

_____

[2]Regarding the younger children, the court found that:

(continued...)

8

[2](...continued)

The testimony of both parents, however, is that Lance does remember Victoria. The Court infers that Lance would like to have contact with Victoria, and this raises an inference that there is a significant deleterious effect on Lance by virtue of denying him visitation with his older sister. This probably is enough to meet the exceptional circumstances standard under *Brandenburg* [ *v. LaBarre*, 193 Md. App. 178, 996 A.2d 939 (2010)] in order to overcome the burden with respect to Lance, however, the Court will also look to the traditional factors in determining exceptional circumstances, as developed in *Ross v. Hoffman*[, 280 Md. 172, 372 A.2d 582 (1977)].

\*     \*     \*

[A]t the time of the visitation hearing, Victoria had been away from the children approximately two years. Lance was approximately 3 years old, and Evan, 18 months when Victoria left the family home. There is a concern over the possible emotional effect on the children, as testified to by both George and Kieran C. The first appearance of Victoria's request to visit her siblings appeared September 14, 2010, about four-and-a-half months after she was adjudged CINA (which occurred April 26, 2010). There is no evidence that the relationship between Lance, Evan, George and Kieran is anything but healthy. The uncontroverted testimony is that, prior to Victoria's leaving the family home, her relationship with Lance was strong; it was less so with Evan, but nevertheless close. The genuineness of Victoria's desire to visit her siblings appears true, and is uncontroverted. The intensity appears strong. *See e.g.*, Hrg. Tr. at 16 (Q: "Since you have been out of the home, can you tell us what the impact of not seeing them has been on you?" A: "It has been like a hole, kind of. I just—I miss them. They were an entire section of my life.") Although Joan McInerney, a private therapist, testified that Victoria's feelings toward sibling visitation were "[n]ot strong," the Court discounts this testimony because the purpose of those therapy sessions was aimed at

(continued...)

9

The court clearly found that Lance and Evan would suffer harm as a result of being further deprived of visitation with their sister. Although the court did discuss the circumstances surrounding Victoria's departure and the harm she suffered as a result of not

<hr />

[2](...continued)

> reconciling the relationship between Victoria and George C., which that witness testified she believed was paramount to continuing her therapy.
>
> While there is concern over the possible emotional effect on the children, the applicable traditional factors in determining exceptional circumstances in balance appear to show exceptional circumstances. While Victoria was in Texas, visitation would have been impractical if not impossible. She sought visitation within five months of being adjudged CINA, showing a desire to reestablish a relationship with her siblings. The disruption to the children's' [sic] lives seem[s] to be minimal and the benefits to Victoria are great. While the parent-child relationship appears healthy between the two minors and the two parents, that relationship is likely to remain healthy also, despite visitation.
>
> Furthermore, it cannot be ignored that the reason Victoria C. is before the Court and the reason she does not have contact with her siblings to begin with is because she left the family home following a DSS investigation that found an indication of abuse against her father. The plan developed resulted in Victoria's removal from the family home to her maternal aunt's home in Texas. When circumstances changed, she returned to her home state of Maryland to be placed in a hotel because she was not accepted back into the family home, which resulted in her being taken into the limited guardianship of the State through the Carroll County Department of Social Services. This would also appear to be an exceptional circumstance determined on a "case-by-case" basis, as allowed for in *Aumiller* [ *v. Aumiller*, 183 Md. App. 71, 959 A.2d 849 (2008)].

10

being able to visit with her brothers, to reverse the trial court on grounds that it "focused primarily on Victoria" is to both usurp that court's fact-finding role and ignore its discretionary powers. Clearly, the trial court considered the impact on both Victoria and the brothers. It is not our function, as an appellate court, to parse the relative strength of the trial court's various factual findings.

And, as we have explained, "[d]ecisions concerning visitation generally are within the sound discretion of the trial court, and are not to be disturbed unless there has been a clear abuse of discretion." *In re Billy W.*, 387 Md. 405, 447, 875 A.2d 734, 758 (2005) (citations omitted). The Majority does not explain how the Circuit Court's determination that visitation would be in the best interests of Lance and Evan was "'well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable.'" *Dehn v. Edgecombe*, 384 Md. 606, 628, 865 A.2d 603, 616 (2005) (quoting *North v. North*, 102 Md. App. 1, 13–14, 648 A.2d 1025, 1031–32 (1994)).

At the time the ruling was made, Lance and Evan were 3 and 5 years old, respectively. At such a young age, children are unable to conceptualize complicated events like those surrounding Victoria's departure and the consequences of the changing family dynamic, and are ill-equipped to explain their feelings on the matter with any specificity. Thus, a court could **only** infer, based on the evidence and testimony submitted to it, that there would be harm or a deleterious effect on such children. Indeed, one is left to wonder what manner of evidence would satisfy the Majority that such young children would be harmed, if the loss

11

of a beloved and remembered older sister is viewed as insufficient.

It is my fear that the Majority announces a standard rendering it effectively impossible to demonstrate that a younger sibling would suffer significant deleterious harm if deprived of visitation with an elder sibling. Indeed, under the Majority's rule, were George and Kieran to abandon Lance as they have Victoria, Evan would not be able to show that he would suffer significant harm from being deprived of visitation with his older brother. By announcing that the "evidence on th[e] record which demonstrate[s]" harm on the non-petitioning children must rise above evidence that a beloved sibling has disappeared from the visited child's life, the Majority renders the task of demonstrating such harm unknowable. (Maj. Slip Op. at 25).

### *The Majority's Holding Invites Abuse*

Finally, I dissent because I believe the Majority's rule will invite abuse, and present abused children with an impossible choice. Victoria was declared a CINA, and a Department of Social Services investigation into allegations of abuse yielded a result of "indicated." Yet the Majority looks at this situation, involving damage to the entire family unit, and holds that the Circuit Court erred in finding exceptional circumstances.

For reasons that are not quite clear, the Majority construes Victoria's departure from the home, and her being separated from Lance and Evan, as pertaining only to Victoria. This implies that a finding of exceptional circumstances as to Lance and Evan is markedly different than a finding of exceptional circumstances as to Victoria. Nothing in *Koshko*

12

supports such a distinction. Rather, *Koshko* requires that there be exceptional circumstances surrounding the denial of visitation. To hold, as the Majority does, that a sibling being removed from the house under allegations of abuse and later denied reunification with her family is not an exceptional circumstance, is to invite the very abuse I describe.

After this ruling, children like Victoria who believe they are being physically or emotionally abused by a parent face the following Hobson's Choice: either (a) report the abuse, get declared CINA, and leave the custody of their parents while risking having all access to their siblings cut off; or (b) endure the continued physical or emotional abuse. Indeed, under the Majority's rule, children who leave an abusive household have no recourse to attempt to gain visitation with their siblings unless their former abusers consent to it. I find this result deeply troubling.

The Majority transforms the wishes of parents from presumptively valid to essentially absolute. Even in a case like this, in which the parents demonstrate an inability or unwillingness to care for one of their children, the Majority elects to enhance the protections given to parents at the expense of children who have been forced out of their homes. It would be no great harm to the strong and significant protections given to the wishes of presumptively fit parents, were we to announce a rule that in a unique situation like this, the juvenile court may make a determination harmonious with, if not based on, Md. Code (1994,

13

2012 Repl. Vol.), § 5-525.2(b) of the Family Law Article.[3]  Considering the best interests of all children involved, and allocating significant weight to the wishes of the parents, does not undermine the protection from arbitrary judicial inquiry embedded in *Koshko*.

For the above reasons, I would reverse the Court of Special Appeals and affirm the judgment of the Circuit Court.

Judge Greene authorizes me to state that he shares the views set forth in this dissenting opinion.

---

[3]I also disagree with the Majority's dictum that Md. Code (1994, 2012 Repl. Vol.), § 5-525.2(b) of the Family Law Article is applicable only "among siblings who are in an out-of-home placement[.]" (Maj. Slip Op. at 19–20, n.12).  Nothing in the statutory language requires that **all** the siblings be placed in foster care in order for one sibling to avail herself of the statute.  The statute clearly covers siblings that have been separated by foster care.  Victoria was placed in foster care and separated from Lance and Evan.  The Majority's bare assertion that the statute is only meant to cover visitation among siblings who are all removed from a home is unsupported by the text or context of this statute.

14